**FOX ROTHSCHILD LLP**
**(formed in The Commonwealth Of Pennsylvania)**
1301 Atlantic Avenue
Midtown Building, Suite 400
Atlantic City, NJ 08401-7212
(609) 348-1515 (phone)/(609) 348-6834 (fax)
Michael J. Viscount, Jr., Esquire (MV 4219)
Joshua T. Klein, Esquire (JK 8978)
Brian R. Isen, Esquire (BI 9738)
mviscount@foxrothschild.com
jklein@foxrothschild.com
bisen@foxrothschild.com
*Proposed Attorneys for the Debtor*
*and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>ATLANTIC BROADCASTING OF LINWOOD NJ LIMITED LIABILITY COMPANY,<br><br>        Debtor. | Chapter 11<br><br>Case No. 10-<br><br>Hon. _____ |

**DEBTOR'S MOTION FOR ORDERS (A) AUTHORIZING DEBTORS**
**(I) TO OBTAIN POST-PETITION FINANCING AND GRANTING SECURITY**
**INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE**
**STATUS PURSUANT TO 11 U.S.C. § 364; (II) TO USE CASH COLLATERAL**
**PURSUANT TO 11 U.S.C. § 363; (III) TO PROVIDE ADEQUATE PROTECTION**
**PURSUANT TO 11 U.S.C. § 361; AND (B) SCHEDULING A FINAL HEARING**
**AND ESTABLISHING RELATED NOTICE REQUIREMENTS**

Atlantic Broadcasting of Linwood NJ Limited Liability Company (the "Debtor" or the

"Borrower"), as a debtor and debtor-in-possession in the above-captioned case (the "Case"),

hereby moves (the "DIP Motion"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2),

364(c)(3), 364(d), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the

"Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") for entry of an interim order (the "Interim Order"), *inter alia*,

(i) authorizing the Debtor to obtain secured postpetition financing on a superpriority basis (the "DIP Facility") pursuant to the terms and conditions of that certain Loan Reaffirmation and Amendment to Loan Agreement (as amended, supplemented, restated, or otherwise modified from time to time, the "DIP Agreement") by and between the Borrower Sun National Bank ("DIP Lender"), substantially in the form attached hereto as Exhibit A;

(ii) authorizing the Debtor to execute and deliver the DIP Agreement and the other related credit documents (the "DIP Documents") by and between the Borrower and the DIP Lender, and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii) granting the DIP Facility and all obligations owing thereunder and under the DIP Documents to the DIP Lender (collectively, and including all "Obligations" as described in the DIP Agreement, the "DIP Obligations") allowed superpriority administrative expense claim status in the Case and any Successor Cases (as defined herein);

(iv) granting to the DIP Lender, automatically perfected security interests in and liens upon all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, which liens shall be subject to the priorities set forth herein;

(v) authorizing and directing the Debtor to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, without limitation, closing fees and the reasonable fees and disbursements of the attorneys, advisors, accountants, and other consultants of the DIP Lender, all to the extent provided in and in accordance with the terms of the DIP Documents;

(vi) authorizing the use of Cash Collateral of the Prepetition Secured Lender under the Prepetition Credit Documents (each as defined herein), and providing adequate protection to the Prepetition Secured Lender for any Diminution in Value of its interests in the Prepetition Collateral, including the Cash Collateral (each as defined herein);

2

(vii)  vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order, as limited pursuant hereto; and

(viii)  scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and approval of the DIP Facility on a final basis and approving the form of notice with respect to the Final Hearing.

In support of the DIP Motion, the Debtor, by and through their undersigned counsel, respectfully represent:

## Preliminary Statement

1.      The Debtor hereby seeks, through approval of the Interim Order, authorization to obtain the post-petition financing provided by the DIP Facility to provide the Debtor with the liquidity necessary to operate during Chapter 11.  With access to the liquidity provided by the DIP Facility, the Debtor will have the ability to maintain their business as a going concern, retain the ability to operate, maintain business relationships with their vendors, suppliers, and customers, pay their employees, and pursue a sale of the Debtor as a going concern in order to maximize value for its estate and creditors.  By this motion, the Debtor will demonstrate that they have met the Bankruptcy Code's standards for approval of debtor-in-possession financing on the terms required by the DIP Facility and the DIP Agreement.  Accordingly, the DIP Motion should be approved.

## Jurisdiction

2.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

3.      Venue of this proceeding and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

PH1 2689210v1 12/18/10

4.      The statutory predicate for the relief requested in this Motion is sections 105, 261, 263, 363, 364 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014.

5.      On December 17, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").  The Debtor continues to operate its business and property as debtor-in-possession in accordance with Sections 1107 and 1108 of the Bankruptcy Code.  No trustee, examiner or creditors' committee has been appointed in this Chapter 11 case.

6.      The factual background relating to the commencement of these Chapter 11 cases is set forth in detail in the *Affidavit of John Caracciolo, Chief Executive Officer of the Debtor In Support of First-Day Motions* (the "Affidavit"), which is incorporated herein.

7.      As set forth more fully in the Affidavit, Atlantic Broadcasting operates five prominent radio stations in the Atlantic City and Cape May, New Jersey, markets from a central location at 1601 New Road in Linwood, New Jersey.  Broadcasts formats including Rock, Talk, Spanish, Top 40 and Classic Hits.

8.      The Debtor commenced this Chapter 11 case in order to permit the Debtor to conduct a sale of its business as a going concern under Section 363 of the Bankruptcy Code.

### Summary of the Debtor's Prepetition Indebtedness

9.      On October 15, 2008, the Debtor entered into a Loan Agreement and signed associated documents and instruments or indebtedness and security (the "Prepetition Loan and Security Documents") in connection with a loan of $6.5 million (the "Prepetition Loan") made by the Secured Lender.  The Prepetition Loan is secured by substantially all of the Debtor's assets, including all of the real estate, transmission towers, equipment, accounts and other tangible and intangible personal property as and to the extent described in the Prepetition Loan

PH1 2689210v1 12/18/10

and Security Documents (the "Prepetition Collateral").  It is the position of the Debtor that the Prepetition Collateral does not include the FCC Licenses (as defined above and in the Prepetition Loan and Security Documents).  As of the Petition Date, the most recent information provided to the Company by the Secured Lender states that the amount due on the Prepetition Loan, including accrued interest and unpaid principal totals approximately $6.3 million (the "Prepetition Secured Debt").

10.     According to the Debtor's books and records, as of the Petition Date, the Company owes approximately $1,181,811.39 in unsecured debt.  The unsecured debt of the Debtor consists of trade debt, lease obligations and other debt arising from the operations of the Debtor's business, as well as several judgments.

## The Debtor's Need for Postpetition Financing

11.     The Debtor filed Chapter 11 with the principal objective to reorganize through the sale its assets and business as a going concern under Bankruptcy Code Section 363.  As a consequence of the factors described in the Caracciolo Declaration, the Debtor has insufficient cash to maintain business relationships with their vendors, suppliers, customers and employees, and, in the event that any or all of those relationships are adversely affected by the commencement of this Case, the Debtor will most likely face the prospect of having insufficient cash to finance their operations, to pay their employees and to accomplish its goals for this Chapter 11 Case.

12.     The Debtor urgently needs credit and additional capital to mitigate any negative effect of this Case and to continue their businesses and operations and to implement a sale process.  Absent availability of new credit, the Debtor's business will be severely and negatively

PH1 2689210v1 12/18/10

impacted, which will in turn severely and negatively impact the going concern value of the

Debtor's assets.

13.     Accordingly, the Debtor requires the availability of working capital from the DIP

Facility and the use of Cash Collateral.  The DIP Facility will instill a sense of confidence in the

Debtor's employees, customers, vendors, and other important stakeholders.   The Debtor

critically needs the support of these stakeholders at this time, as the loss of their support could

severely impair the Debtor's ability to maximize the value of their estates.

14.     In sum, without the immediate access to post-petition financing, the Debtor

expects to suffer immediate and irreparable harm to its estate and creditors.  The Debtor's ability

to preserve the value of its estate for the benefit of its creditors depends upon the interim and

final relief requested in this DIP Motion.

## <u>Summary of the Debtor's Proposed DIP Financing</u>[1]

15.     The Debtor has determined, in the exercise of its sound business judgment, that to

meet their working capital needs they require a postpetition credit facility in substantially the

form described herein.  Accordingly, subject to the Court's approval, the Debtor have determined

to enter in the DIP Agreement with the DIP Lender.

16.     The terms of the DIP Facility are more specifically set forth in the DIP Agreement

attached hereto as <u>Exhibit A</u>.  The key provisions of the DIP Agreement are as follows:

<u>Lender</u>: Sun National Bank

<u>Borrower</u>: Atlantic Broadcasting of Linwood NJ Limited Liability Company

---

[1] The summaries and descriptions of the terms and conditions of the DIP Agreement and the proposed Interim Order
set forth in the DIP Motion are intended solely for informational purposes to provide the Court and parties in interest
with an overview of significant terms thereof and should only be relied upon as such.  The summaries and
descriptions are qualified in their entirety by the DIP Agreement and the Interim Order.  In the event there is a
conflict between the DIP Motion and the DIP Agreement or the Interim Order, the DIP Agreement and/or the
Interim Order, as applicable, shall control in all respects.  Any capitalized terms not otherwise defined herein shall
have the meanings ascribed to them in the DIP Documents and/or the Interim Order.

<u>Authorized Borrowings – Line of Credit</u>.  The DIP Lender shall advance the "Maximum Post-Petition Advance." The Maximum Post-Petition Advance shall be the aggregate of (i) the amount required to refinance in full the Pre-Petition Obligations (as defined in the DIP Agreement) and (ii) a revolving loan (the "<u>Revolver</u>") up to the principal amount of $500,000 for the purpose of funding, in accordance with the Budget attached hereto as <u>Exhibit B</u>, until the Termination Date.

<u>Interest</u>:  Interest will accrue under the DIP Facility at the rate of eleven and one-half (11.50%) percent per annum measured from the date advanced.  Payment of interest during the period covered by the Budget shall be paid in accordance with the Budget.

<u>Carve Out</u>.  "Carve Out" means, upon the occurrence of the Termination Declaration Date, the following expenses: (i) all statutory fees payable to the clerk of the Court or the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (ii) the allowed and unpaid professional fees, expenses and disbursements incurred   by the Debtor   for any professionals retained by final order of the Court (which order has not been vacated or stayed, unless the stay has been vacated) by the Debtor under sections 327 or 328 of the Bankruptcy Code (the "<u>Debtor's Professionals</u>") in an aggregate amount (the "Debtor's Professionals Carve Out") not to exceed the sum of $100,000.00 (inclusive of the professional fees allocated in the Budget) for Debtor's general bankruptcy attorneys Fox Rothschild LLP and additional amounts that may be agreed to by the Debtor and the Lender, but without obligation to do so solely except as set forth in the Budget, for funding of other professionals required to be retained by the Debtor (including the reimbursement for fees and  expenses allowed by the Bankruptcy Court incurred by Debtor's Professionals in the performance of its duties incurred prior to the Termination Declaration Date, but which remain unpaid as of the Termination Declaration Date, but solely to the extent incurred in accordance with the Budget (collectively, the "<u>Allowed Debtor Professional Fees</u>").

<u>DIP Liens</u>.  In order to secure the DIP Obligations, effective immediately upon entry of the Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens upon (collectively, the "<u>DIP Liens</u>") on any and all tangible and intangible personal property, real property, assets, and rights of the Debtor or its estate, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof, , including, without limitation (capitalized terms to be applied consistent and in accordance with the New Jersey Uniform Commercial Code), (a) all Accounts, Equipment, Goods, Inventory, Fixtures, Documents (including, if applicable, electronic documents), Instruments, Notes, Chattel Paper ( whether tangible or electronic), General Intangibles (including without limitation including all payment intangibles), Letters of Credit and Letter-of-Credit Rights; pledged collateral; securities and Investment Property, and Intellectual Property;   (b) to the fullest extent permitted by law, the FCC Licenses (as defined in the Prepetition Credit and Security Documents and the DIP Documents); (c)   all books and records; (d) all deposit accounts; (e) all commercial tort claims and other causes of action and claims, <u>but</u> <u>not</u> including those

arising under Chapter 5 of the Bankruptcy Code ("Avoidance Actions");(f) all money and any other contract rights or rights to the payment of money; (g) all insurance claims and proceeds, and any indemnity, warranty or guaranty payable to the Debtor from time to time; (g) the Borrower's rights under section 506(c) of the Bankruptcy Code, other than against the DIP Lender, and the proceeds thereof; (h) the Prepetition Collateral, and (i) to the extent not covered in the foregoing, all other property of the Debtor, whether tangible or intangible, real or personal, and all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing (collectively, the "DIP Collateral").  The DIP Liens shall not be subject to Sections 510, 549 (to the extent that a successful action is brought against the DIP Lender) or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be pari passu with or senior to the DIP Liens.  For the avoidance of doubt, the DIP Collateral shall not include any prepetition or postpetition rights of the Debtor with respect or under any provisions of Chapter 5 of the Bankruptcy Code.

DIP Lien Priority.  The DIP Liens securing the DIP Obligations are valid, binding, continuing, automatically and properly perfected as of the date of the Interim Order, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the DIP Liens shall be junior only to the Carve Out.  Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior to the Prepetition Liens and the Adequate Protection Liens (as defined herein) on all DIP Collateral.  The DIP Liens shall not be made subject to or pari passu with any lien or security interest heretofore or hereinafter granted in the Case or any Successor Case, upon the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Case or Successor Case.  No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be pari passu with or senior to the DIP Liens.

Superpriority Claim.  Upon entry of the Interim Order, the DIP Lender shall be granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Case and any Successor Case (collectively, the "DIP Superpriority Claim") for all DIP Obligations:  (a) with priority over any and all administrative expense claims and unsecured claims against the Debtor or its estate in the Case and any Successor Case, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtor and its estate, and any successor trustee or other estate representative to the extent permitted by law.  Notwithstanding the foregoing, the DIP Superpriority Claim shall be subject to the Carve Out.

Adequate Protection Liens.   Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Secured Lender in the Prepetition Collateral to the extent of any Diminution in Value of such interests in the Prepetition Collateral on account of, among other things, the granting of the DIP Liens, the Debtor's use of Cash Collateral and other Prepetition Collateral, the use, sale or lease of any other Prepetition Collateral, market value decline of collateral, the priming of the Prepetition Liens and the imposition of the automatic stay, the Debtor grants, irrevocably to the extent allowed by law, to the Prepetition Secured Lender continuing valid, binding, enforceable, and perfected postpetition security interests in and lien on the DIP Collateral (the "Adequate Protection Liens").

Priority of Adequate Protection Liens.   The Adequate Protection Liens shall be junior only to:  (A) the Carve Out; and (B) the DIP Liens.  The Adequate Protection Liens shall be senior to all other security interests in, liens on, or claims against any of the DIP Collateral.  The Adequate Protection Liens shall not be made subordinate, subject to, or *pari passu* with any lien or security interest heretofore or hereinafter in the Case or any Successor Case, and shall be valid and enforceable against any trustee appointed in the Case or any Successor Case, or upon the dismissal of any of the Case or Successor Case. No lien or interest avoided and preserved for the benefit of the estate pursuant to Section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Prepetition Liens or the Adequate Protection Liens.

Adequate Protection Superpriority Claims.   As further adequate protection of the interests of the Prepetition Secured Lender in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral on account, among other things, of the granting of the DIP Liens, the Debtor's use of Cash Collateral, the use, sale, or lease of any other Prepetition Collateral, the use, sale or lease of any other Prepetition Collateral, market value decline of collateral, the priming of the Prepetition Liens and the imposition of the automatic stay, the Prepetition Secured Lender is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Case and any Successor Case (the "Adequate Protection Superpriority Claim").

Priority of Adequate Protection Superpriority Claim.  Except as set forth in the Interim Order, the Adequate Protection Superpriority Claims shall have priority over all administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114; provided, however, that:   (i) the Adequate Protection Superpriority Claims shall be junior to the DIP Superpriority Claim; and (ii) the Adequate Protection Superpriority Claims shall be junior to the Carve Out.  In the event that any of the Prepetition Liens are determined to be invalid with respect to any asset(s) of the Debtor, and such asset(s) are sold pursuant to a Proposed Sale, the DIP Superpriority Claim and the Adequate Protection

Superpriority Claim shall be satisfied, in that order, first from the proceeds allocated to the sale of such asset(s).

Application of Proceeds/Roll-Up.  Upon entry of the Final Order,  proceeds of the DIP Facility shall  be used to repay in full the Prepetition Loan.  Amounts funded under the Revolver shall be used in accordance with the Budget.

Remedies Upon Event of Default.  Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Lender may declare (1) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (2) the termination, reduction, or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains, and (3) the termination of the DIP Agreement and any other DIP Document as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations; (4) the DIP Lender and the Prepetition Secured Lender may declare a termination, reduction, or restriction on the ability of the Debtors to use any Cash Collateral; and (iv) the DIP Lender may collect and apply proceeds of the DIP Collateral and the Debtor shall have an affirmative duty to continue to remit proceeds of the DEP Collateral (including without limitation Dash Collateral to the DIP Lender. Any such declaration, as aforesaid, shall be referred to herein as "Termination Declaration."  The Termination Declaration shall be given by facsimile (or other electronic means) to counsel to the Debtors, respective counsel to the Creditors Committee, and the U.S. Trustee (and the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date"). The DIP Lender shall provide five (5) business days' notice of its intention to declare a Termination Declaration (the "Remedies Notice Period").  Upon expiration of the Remedies Notice Period, the DIP Lender shall be entitled to exercise any and all of its rights and remedies in accordance with the DIP Documents and this Interim Order, or otherwise available at law, in equity, or both, each of which, when exercised, shall be deemed to be cumulative, to satisfy the DIP Superpriority Claim and the DIP Liens, subject to the Carve Out, and the Prepetition Secured Lender shall be entitled to exercise its rights and remedies to satisfy the Prepetition Credit Obligations, the Adequate Protection Superpriority Claims, and the Adequate Protection Liens, subject to the Carve Out.  The automatic stay will be deemed vacated, automatically and without the need for further Court hearing or order, to give effect to, and to enable the Lender to pursue, its rights and remedies as aforesaid.  The Debtor acknowledges and agrees, and the Interim Order provides, that the only issue to be determined and decided at any Court hearing during the Remedies Notice Period is whether a default has occurred and is continuing under the DIP Documents, or whether a DIP Termination Date has occurred.  Unless the Court determines during the Remedies Notice Period that an a default has not occurred and/or is not continuing, or whether a DIP Termination Date has occurred, the automatic stay, as to the DIP Lender and the Prepetition Secured Lender, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period, the DIP Lender and the Prepetition Secured Lender shall be permitted to exercise all remedies set forth herein, in the DIP Agreement, the DIP Documents, the Prepetition Credit Documents, and as otherwise available at law without further order or application or motion to the Court, and without

restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest or any other rights and remedies granted to the DIP Lender and the Prepetition Secured Lender pursuant to the DIP Agreement, the DIP Documents, the Prepetition Credit Documents, or the Interim Order.

### Request for Approval of the DIP Facility

17.     As described above, it is essential to the success of the Case that the Debtor immediately obtain access to sufficient post-petition financing, without which the Debtor's ability to maintain its business operations will be compromised.  The Debtor's continuing ability to maximize the value of its estate for the benefit of its creditors, and its ability to pursue the Proposed Sale at the Auction thus depend heavily upon the expeditious approval of the DIP Facility and the related actions requested herein.

18.     Section 364 of the Bankruptcy Code[2] distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security.  If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, pursuant to Section 364(c) of the Bankruptcy Code,  a court may authorize a debtor-in-possession to obtain

---

[2] Section 364(c) of the Bankruptcy Code provides as follows:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503 (b) or 507 (b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

PH1 2689210v1 12/18/10

credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or combination of the foregoing.  Pursuant to section 364(d) of the Bankruptcy Code,[3] a court may authorize a debtor-in-possession to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is already subject to a lien.

19.    As a condition to entering into the DIP Agreement and obtaining the Debtor's needed liquidity, the Debtor must obtain authorization, pursuant to sections 364(c) and (d) of the Bankruptcy Code, (a) to grant the DIP Lender automatically perfected security interests in and liens upon all of the DIP Collateral, including, without limitation, all property constituting Cash Collateral, and (b) grant the DIP Obligations allowed Superpriority administrative expense claim status in the Case and any Successor Case.

## Approval Under Section 364(c) of the Bankruptcy Code

20.    The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors-in-possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense." *See In re Garland Corp.,* 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) is authorized, after notice and

---

[3] Section 364(d) of the Bankruptcy Code provides as follows:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

PH1 2689210v1 12/18/10

hearing, upon showing that unsecured credit cannot be obtained); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "although a debtor is not required to seek credit from every possible source, a debtor must show that it has made a reasonable effort to seek other sources of credit available under section 364(a) & (b)"); *In re Crouse Group, Inc.,* 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

### The Debtor Was Unable to Obtain Necessary Postpetition Financing on an Unsecured Basis Under Section 364(a) or (b) of the Bankruptcy Code

21.    As set forth in the Caracciolo Affidavit, and as the evidence at the Final Hearing will show, the Debtor could not have obtained a working capital facility of the type and magnitude required in this Case on an unsecured basis.

22.    To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.* at 1088; *see also Ames,* 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for

---

11 U.S.C. § 364(d).

financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom,*
*Anchor Savings Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

23.     The Debtor submits that, other than the DIP Facility, there are no financing
alternatives available under the circumstances.   As this Court is undoubtedly aware, in the
current economic environment, the financing options for a wide variety of companies,
particularly those involved in sub-prime financing, are extremely limited.

24.     Moreover, as noted above, virtually all of the Debtor's assets are encumbered by
liens and security interests.  Alternative financing in an amount sufficient to repay those creditors
and provide additional liquidity is simply not available given the current state of the financial
markets, the nature and state of the Debtor's business operations and the size of the financing
required.  Even if alternative debtor-in-possession financing were available on favorable terms
and conditions and could be consummated in a time frame required to address the Debtor's
liquidity needs, obtaining such financing would likely result in a difficult and protracted priming
contest with the Prepetition Secured Lender, the results of which could not be predicted with
certainty.   Any uncertainty occasioned by protracted financing litigation would be extremely
damaging to the Debtor, immediately jeopardizing its Chapter 11 case at the outset.

**Approval of Priming Liens**

25.     If a debtor-in-possession is unable to obtain credit under the provisions of section
364(c) of the Bankruptcy Code, the debtor-in-possession may obtain credit secured by a senior or
equal lien on property of the estate that is already subject to a lien, commonly referred to as a
"priming lien."  11 U.S.C. § 364(d).  Section 364(d) of the Bankruptcy Code, which governs the
incurrence of postpetition debt secured by priming liens, provides that the court, after notice and

hearing, may authorize the debtor-in-possession to obtain credit or incur debt secured by a senior

or equal lien on property of the estate that is subject to a lien only if –

> (A) the trustee is unable to obtain such credit otherwise; and

> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

26.     As discussed above, the Debtor has explored alternatives and lack alternative

financing options.  In light of that, and given the state of the credit markets, the Debtor has

concluded that financing comparable to that provided by the DIP Lender under the DIP Facility

is currently unobtainable without the priming of the prepetition liens.  *See In re Utah 7000,*

*L.L.C.,* 2008 WL 2654919, *2 (Bankr. D. Utah July 3, 2008) (finding that the debtor unable to

obtain financing without priming of prepetition liens); *In re Mosello,* 195 B.R. 277, 287 (Bankr.

S.D.N.Y. 1996) (same); *In re 495 Central Park Ave. Corp.,* 136 B.R. 626, 630-31 (Bankr.

S.D.N.Y. 1992) (same); *In re Beker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)

(same).

27.     Thus, the Debtor is unable to obtain alternative post-petition financing through

credit allowable on an unsecured basis and without granting priming liens.  In these

circumstances, the Debtor, in the exercise of its considered business judgment and in

consultation with their professional advisors, have determined that the financing provided by the

DIP Facility is the most favorable under the circumstances and provides the Debtor the liquidity

necessary to maintain the going concern value of its business pending the conclusion of the

Debtor's proposed sale process.

PH1 2689210v1 12/18/10

28.     In addition, the Debtor submits that the adequate protection to be provided to the Prepetition Secured Lender, as detailed below, is sufficient to approve the priming of its liens under section 364(d) of the Bankruptcy Code.

**The Postpetition Loan is Necessary to**
**Preserve Assets of the Debtor's Estate**

29.     As stated above, the DIP Facility is essential so that the Debtors can continue to purchase inventory, keep their operations running, and immediately instill their employees, suppliers and customers with confidence in the Debtors' ability meet their obligations to these important stakeholders while it conducts an orderly sale process.  Absent such confidence, the Debtors will not have the resources or support necessary to maintain operations and preserve their values as a going concern.

30.     The success of these cases thus depends on the confidence of the Debtors' employees, vendors, and customers.  If the DIP Motion is denied or delayed, that confidence may be destroyed, and the success of these Chapter 11 cases might be irreparably damaged.  In contrast, once the DIP Facility is approved, the Debtors' ability to provide employees (through a third-party management agreement to be funded under the DIP facility), vendors, customers, and other important stakeholders with the necessary confidence will be assured.  The Debtors' need for access to the DIP Facility is, therefore, immediate.

**The Terms of the DIP Facility are Fair, Reasonable and Appropriate**

31.     In the Debtor's considered business judgment, the DIP Facility is the best financing option available in the circumstances of these cases.  The purpose of the facility is to enable the Debtor to maintain the value of their estates while pursuing a going concern sale of the Debtor's business for the benefit of all stakeholders.

PH1 2689210v1 12/18/10

32.      The proposed DIP Facility provides, generally, that the security interests and administrative expense claims granted to the DIP Lender are subject to, among other items, a the Carve Out for (i) all statutory fees payable to the clerk of the Court or the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (ii) the allowed and unpaid professional fees, expenses and disbursements incurred on or after the Termination Declaration Date by the Debtor and any Statutory Committee for any Case Professionals retained by final order of the Court (which order has not been vacated or stayed, unless the stay has been vacated) by the Debtor or any Statutory Committee under sections 327, 328 or 1103(a) of the Bankruptcy Code (including the reimbursement of expenses allowed by the Bankruptcy Court incurred by any Statutory Committee member in the performance of its duties, but excluding fees and expenses of third party professionals employed by such members), but solely to the extent incurred in accordance with the Budget, plus such fees, expenses and disbursements incurred prior to the Termination Declaration Date, but which remain unpaid as of the Termination Declaration Date, but solely to the extent incurred in accordance with the Budget.  In *Ames Department Store,* the bankruptcy court found that such "carve-outs" are not only reasonable but are necessary to insure that official committees and debtors' estates are adequately assisted by counsel.  *Ames,* 115 B.R. at 40.

### **Application of the Business Judgment Standard**

33.      After appropriate and extensive investigations and analysis, and robust, good faith, and arm's length negotiations among the Debtor and the DIP Lender, the Debtor's management concluded that the DIP Facility and the use of Cash Collateral is the best alternative available in the circumstances of these cases.  Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless

such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.,* 163 B.R. 964, 974

(Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset based facility

were approved because they "reflect[ed] sound and prudent business judgment on behalf of

TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its

creditors"); *In re TM Carlton House Partners, LTD,* 91 B.R. 349, 357 (Bankr. E.D. Pa. 1988)

(holding that due to the debtor's distinct awareness of its own financial needs, the court would

not second-guess its business judgment to put aside cash to effectuate a refinancing of its debts);

*cf. Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.,* 318 U.S. 523, 550 (1943)

(holding that decisions regarding the rejection or assumption of a lease is left to the business

judgment of the debtor); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business

judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus. Inc.,*

37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Assocs.,* 14 B.R. 506, 513-14

(Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor-in-

possession's business decisions when those decisions involve "a business judgment made in

good faith, upon a reasonable basis, and within the scope of his authority under the Code").  In

fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase

its cost, interfere with the Bankruptcy Code's provision for private control of administration of

the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co.*

*v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

34.    The Debtor has exercised sound business judgment in determining that a post-

petition credit facility is appropriate and have satisfied the legal prerequisites to incur debt under

the DIP Facility.  The terms of the DIP Agreement are fair and reasonable and are in the best

interests of the Debtor's estate.  Accordingly, the Debtor should be granted authority to enter into

the DIP Agreement and obtain funds from the DIP Lender on the secured, administrative "superpriority" basis described above, pursuant to sections 364(c) and (d) of the Bankruptcy Code.

### Request for Consensual Use of Cash Collateral

35.     The Debtor  will require the ability to use cash and the proceeds of existing accounts receivable and inventory to maintain the operation of their businesses and preserve their value as going concerns.  These essential items, however, constitute part of the Prepetition Collateral (the "Cash Collateral") and, therefore, may not be used in support of the Debtor's ongoing business activities absent compliance with section 363(c)(2) of the Bankruptcy Code, which provides as follows:

> (2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>
> (A) each entity that has an interest in such cash collateral consents[.]

11 U.S.C. § 363(c)(2).

36.     In the instant case, the Prepetition Secured Lender has consented to the Debtor's use of Cash Collateral.  As a result, and because the such use is essential to the preservation of the Debtor's estate, the Court should approve the Debtor's use of Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

### Approval of Adequate Protection

37.     In exchange for the Debtor's use of Prepetition Collateral, including Cash Collateral, and its priming of the prepetition liens, the Prepetition Secured Lender is entitled to receive adequate protection pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any diminution in the value of each of its respective interests in the Prepetition Collateral

PH1 2689210v1 12/18/10

(including Cash Collateral) resulting from the Debtor's use, sale, or lease (or other decline in value) of such collateral, the imposition of the automatic stay, the priming of prepetition liens on Prepetition Collateral (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

38.     The Debtor proposes to provide the Prepetition Secured Lender with adequate protection in accordance with sections 361, 363, and 364 of the Bankruptcy Code.  To that end, the Debtors and the Prepetition Secured Lender have negotiated, and the Debtors request the Court approve, as of the Petition Date, certain protections of the Prepetition Secured Lender's interest in Prepetition Collateral from any Diminution in Value of each of its respective interests in the Prepetition Collateral.  Such adequate protection, as described more fully in the Interim Order, is summarized below.

A.     <u>Adequate Protection Liens</u>.  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Prepetition Secured Lender in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors propose to grant to the Prepetition Secured Lender, the Adequate Protection Liens (a continuing valid, binding, enforceable, and perfected postpetition security interests in and lien on the DIP Collateral).

B.     <u>Superpriority Claim</u>.  As further adequate protection of the interests of the Prepetition Secured Lender in the Prepetition Collateral against any Diminution in Value of such interests in the Prepetition Collateral, the Debtors propose to grant, to the extent provided by section 507(b) of the Bankruptcy Code, an allowed

PH1 2689210v1 12/18/10

superpriority administrative expense claim in each of the Case and any Successor Case.

     C.    <u>Adequate Protection Payments and Protections</u>.   As further adequate protection, subject to the reservation of rights set forth in paragraph 32 of the Interim Order, the Debtor has agreed to provide adequate protection in the form of: (a) payments of interest, fees, and other amounts due under the Prepetition Secured Lender's loan documents, at the times specified therein, to the Prepetition Secured Lender and (b) continued maintenance and insurance of the Prepetition Collateral and the DIP Collateral in amounts and for the risks, and by the entities, as required under the Prepetition Credit Documents, the DIP Documents, and the Interim Order.

    39.    The Debtor believes that the proposed adequate protection is fair and reasonable. The Prepetition Secured Lender has agreed that the adequate protection summarized above and provided for in the Interim Order is sufficient to allow the Debtor to use Cash Collateral. Furthermore, the priming of the Prepetition Liens will enable the Debtors to obtain the DIP Facility.   As a result, the Prepetition Secured Lender consents to such priming liens and is entitled to receive adequate protection of its interest in the Prepetition Collateral.

    40.    Accordingly, based on the foregoing, the Debtor respectfully requests that the Court authorize the Debtor to provide certain adequate protections in accordance with the terms set forth in the Interim Order.

## <u>Good Faith</u>

    41.    The Debtor submits that the terms and conditions of the DIP Facility and the DIP Agreements, and the fees paid and to be paid thereunder, are fair, reasonable, and the best

PH1 2689210v1 12/18/10

available to the Debtors under the circumstances.  As stated above, the Debtor, the DIP Lender

and the Prepetition Secured Lender negotiated the terms and conditions of the DIP Agreement

and the use of Cash Collateral in good faith and at arm's length.  Moreover, the Debtor's

decision to enter into the DIP Agreement was an exercise of the Debtor's prudent business

judgment.  Therefore, the DIP Lender and the Prepetition Secured Lender should be accorded the

benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the

DIP Agreements, or any interim or final order of this Court pertaining thereto, are hereafter

modified, vacated, stayed or terminated by subsequent order of this or any other court.

### Request for Modification of the Automatic Stay

42.     The Interim Order contemplates a modification of the automatic stay established

pursuant to section 362 of the Bankruptcy Code, to the extent necessary, to effectuate all of the

terms and provisions of the Interim Order, including, without limitation, to (a) permit the Debtor

to grant the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claim, and the

Adequate Protection Superpriority Claim; (b) permit the Debtor to perform such acts as the DIP

Lender or any Prepetition Secured Lender may request in its sole discretion to assure the

perfection and priority of the liens granted herein; (c) permit the Debtor to incur all liabilities and

obligations to the DIP Lender and the Prepetition Secured Lender under the DIP Documents, the

DIP Facility, and the Interim Order; and (d) authorize the Debtor to pay and the DIP Lender and

the Prepetition Secured Lender to retain and apply payments made in accordance with the terms

of the Interim Order.

43.     Stay modification provisions of this type are customary features of post-petition

debtor-in-possession financing facilities and, in the Debtor's business judgment, are reasonable

under the circumstances.  Accordingly, the Court should modify the automatic stay to the extent

contemplated by the Interim Order.

## Request for Modification of the Automatic Stay

44.    In order to successfully implement the foregoing, the Debtor respectfully requests

that the Court waive the notice requirements provided for by Bankruptcy Rule 6004(a), the

twenty-day stay provided for by Bankruptcy Rule 6003(b), and the ten-day stay provided for by

Bankruptcy Rule 6004(h).  The Debtors believe, for the reasons set forth above, that ample

justification exists for the Court to waive Bankruptcy Rule 6003(b), 6004(a), and 6004(h).

## Request for Final Hearing

45.    Pursuant to Bankruptcy Rule 4001(c)(2), the Debtor requests the Court to set a

date for the Final Hearing that is no later than 25 days from the Petition Date.

46.    Notice of the DIP Motion has been provided by the Debtor, whether by facsimile,

email, overnight courier, or hand delivery, to certain parties in interest, including:  (i) the Office

of the United States Trustee; (ii) the creditors holding the 20 largest unsecured claims against the

Debtor's estate; (iii) the Debtor's equity holders; (iv) counsel to the DIP Lender and Prepetition

Secured Lender; and (v) any other entity or individual that has asserted a security interest or lien

in any of the DIP Collateral.  The parties have made reasonable efforts to afford the best notice

possible under the circumstances and such notice is good and sufficient to permit the interim

relief set forth in the Interim Order.

WHEREFORE, the Debtor respectfully requests that the Court (i) enter an order

substantially in the form of the Interim Order annexed hereto as Exhibit B; (ii) schedule the Final

Hearing, (iii) after the Final Hearing, enter a Final Order substantially in the form of the Interim

PH1 2689210v1 12/18/10

Order and as filed with the Court prior to the Final Hearing; and (iv) grant such other and further

relief as is just and proper.

DATED:  December 20, 2010                Respectfully submitted,

                                         FOX ROTHSCHILD LLP
                                         (Formed in the Commonwealth of Pennsylvania)

                                         *Proposed Counsel for Debtors and Debtors-in-Possession*


                                         By:____/s/ Joshua T. Klein, Esquire_____
                                              Michael J. Viscount, Jr., Esquire
                                              Joshua T. Klein, Esquire
                                              Brian R. Isen, Esquire