# Exhibit "A"

<u>LOAN REAFFIRMATION AND AMENDMENT TO LOAN AGREEMENT</u>

THIS LOAN REAFFIRMATION AND AMENDMENT TO LOAN AGREEMENT (this "Agreement"), is dated December 20, 2010 by and between ATLANTIC BROADCASTING OF LINWOOD NJ LIMITED LIABILITY COMPANY, with an office located at 1601 New Road, Linwood, New Jersey 08221 (the "Debtor" or "Borrower") and Sun National Bank (the "Lender") with an address of 226 Landis Avenue, Vineland, New Jersey 08360.

BACKGROUND

A.      On December 20, 2010, (the "Petition Date"), the Borrower commenced Chapter 11 Bankruptcy Case No. 10-_____ by filing a voluntary petition for reorganization under Chapter 11, 11 U.S.C. 101, <u>et seq.</u> (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of New Jersey.

B.      Prior to the commencement of the Chapter 11 Case, the Borrower became indebted to the Lender on account of loan in the original principal sum of Six Million Five Hundred Thousand Dollars ($6,500,000.00) (the "Pre-Petition Loan"), which Loan is evidenced by a note, dated October 15, 2008, and which is secured by a loan agreement, security agreement, mortgages, pledge agreements, collateral assignments, and other agreements, instruments, certificates and documents of same date as set forth on <u>Exhibit A</u> attached hereto and made a part hereof (collectively as amended from time to time, the "Pre-Petition Loan Documents"), each dated of even date with the note, and which evidence or secure some or all of the Borrower's Pre-Petition Obligations to the Lender for one or more loans or other extensions of credit.

C.      The Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its business as a debtor-in-possession.

D.      The Bankruptcy Court has entered an Interim Order (as hereinafter defined) pursuant to which the Lender has agreed to make certain post-petition loans, advances, and other financial accommodations ("DIP Facility") to the Debtor, which is secured by the DIP Collateral (as hereinafter defined), as set forth in the Interim Order, the Pre-Petition Loan Documents, and this Agreement.

E.      The Interim Order provides that as a condition to the making of such Post-Petition Advances, the Debtor shall execute, deliver, and perform this Agreement.

TERMS

NOW THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Debtor and the Lender, intending to be legally bound, hereby mutually covenant, warrant, and agree as follows:

1.     <u>Definitions.</u>  Capitalized, undefined terms herein shall bear the same meanings ascribed to them in the Interim Order.  All terms not specifically defined herein which are defined in the New Jersey Uniform Commercial Code shall have the meaning set forth therein, except that the term "lien" shall have the meaning set forth in §101(37) of the Bankruptcy Code.

1.1     <u>Additional Definitions</u>.  As used herein, the following terms shall have the respective meanings given to them below:

(a)     "Bankruptcy Court" shall have the meaning given in the recitals of this Agreement.

(b)     "Budget" shall have the meaning given in Section 4.1of this Agreement.

(c)     "Chapter 11 Case" shall mean the Chapter 11 case of the Debtor, which is pending in the Bankruptcy Court.

(d)     "Debtor" shall mean the Borrower as debtor and debtor-in-possession in the Bankruptcy Case.

(e)     "DIP Collateral" shall mean all Pre-Petition Collateral and Post-Petition Collateral.

(f)     "DIP Obligations" shall mean all Pre-Petition Obligations and all Post-Petition Obligations.

(g)      "Existing Events of Default" shall have the meaning given in Section 4.7 of the Agreement.

(h)     "Interim Order" and "Final Order" shall mean, respectively, the orders entered or to be entered by the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 4001, in form and substance satisfactory to the Lender, which, among other things, approves, first on an interim basis and thereafter on a final basis, the execution and delivery to the Lender of this Agreement as well as the post-petition financing contemplated herein.

(i)      "Lender" shall have the meaning given in the introductory paragraph to this Agreement.

(j)     "Maximum Post-Petition Advance" shall be the aggregate of (i) the amount required to refinance in full the Pre-Petition Obligations and (ii) the Revolver.

(k)      "Note" shall mean the note evidencing the DIP Facility, in the original principal amount of the Maximum Post-Petition Advance, substantially in the form attached hereto and made a part hereof as <u>Exhibit C</u>.

(l)     "Post-Petition Advances" shall mean the aggregate of the amounts necessary to refinance the full amounts due and owing to the Lender under the Pre-Petition Obligations, and the amounts advanced from time to time under the Revolver.

(m)    "Post-Petition Collateral" shall mean, collectively, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-Petition security interests in and liens upon (collectively, the "<u>DIP Liens</u>") any and all tangible and intangible personal property, real property, assets, and rights of the Debtor or its estate, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof, including, without limitation, (a) all accounts, equipment, goods, inventory, fixtures, documents (including, if applicable, electronic documents), instruments, notes, chattel paper (whether tangible or electronic), general intangibles (including without limitation including all payment intangibles), letters of credit and letter-of-credit rights; pledged collateral; securities and investment property, and intellectual property;    (b) to the fullest extent permitted by law, the FCC Licenses (as defined in the Pre-Petition Loan Documents and the DIP Documents); (c) all books and records; (d) all deposit accounts; (e) all commercial tort claims and other causes of action and claims, but not including those arising under Chapter 5 of the Bankruptcy Code ("Avoidance Actions"); (f) all money and any other contract rights or rights to the payment of money; (g) all insurance claims and proceeds, and any indemnity, warranty or guaranty payable to the Debtor from time to time; (g) the Borrower's rights under section 506(c) of the Bankruptcy Code, other than against the DIP Lender, and the proceeds thereof; (h) the Pre-Petition Collateral, and (i) to the extent not covered in the foregoing, all other property of the Debtor, whether tangible or intangible, real or personal, and all proceeds and products of each of the foregoing, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing.  For the avoidance of doubt, the Post-Petition Collateral shall not include any pre-petition or post-petition rights of the Debtor with respect to or under any provisions of Chapter 5 of the Bankruptcy Code.

(n)    "Post-Petition Obligations" shall mean all now existing and hereafter arising loans, advances (including, without limitation, all Post-Petition Advances), debts, obligations, liabilities, covenants, and duties of the Debtor to the Lender of every kind and description, however evidenced, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not due, primary or secondary, liquidated or unliquidated, arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Case, or before, during, and after the confirmation of any plan of reorganization in the Chapter 11 Case, and whether arising under or related to the Chapter 11 Case, this Agreement, the other DIP Documents, the Interim Order, the Final Order, by operation of law or otherwise, and whether incurred by the Debtor as principal, surety, endorser, guarantor, or otherwise and including, without limitation, all principal, interest, financing charges, servicing fees, DIP Facility fees, early termination fees, other fees, commissions, costs, expenses, and attorneys, accountants, and consultants fees and expenses incurred in connection with any of the foregoing.

(o)    "Pre-Petition Collateral" shall mean any and all assets (including, without limitation, all personalty and real property) which collateralize and/or secure the Pre-Petition Obligations under, in connection with and pursuant to the Pre-Petition Loan Agreements or otherwise in favor of the Lender, and "Pre-Petition Liens" shall mean each mortgage, security interest, and other lien or encumbrance that secures the "Pre-Petition Collateral."

(p)    "Pre-Petition Obligations" shall mean all loans, advances, debts, obligations, liabilities, indebtedness, covenants, and duties of the Debtor to the Lender of every

3

kind and description, however evidenced, whether direct or indirect, absolute or contingent, joint or several, secured or unsecured, due or not due, primary or secondary, liquidated or unliquidated, arising before the Petition Date and whether arising under or related to the Pre-Petition Loan Agreements, by operation of law or otherwise and whether incurred by the Debtor as principal, surety, endorser, guarantor, or otherwise and including, without limitation, all principal, interest, financing charges, unused line fees, servicing fees, line increase fees, early termination fees, other fees, commissions, costs, expenses, and attorneys, accountants, and consultants fees and expenses incurred in connection with any of the foregoing.

(q)    "Pre-Petition Released Claim" shall have the meaning given in Section 6.1 of the Agreement.

(r)    "Release" shall have the meaning given in Section 6.2 of this Agreement.

(s)    "Revolver" shall mean a revolving loan to be advanced by the Lender after the Petition Date, in accordance with the terms of this Agreement and the Interim Order, up to the principal amount of $500,000, for the purpose of funding the Budget until the Termination Date. The Debtor shall have the right to repay portions of the Revolver and subsequently request additional advances in accordance with the terms and provisions hereof and of the Interim Order; provided, however, that the Lender shall have no obligation to make any advances if the amount requested to be advanced, together with the then outstanding and previously advanced principal amount under the Note, exceeds the sum of FIVE HUNDRED THOUSAND ($500,000) DOLLARS.

(t)    "Termination Date" shall have the meaning given in Section 4.8 of this Agreement.

1.2    Interpretation.

(a)    All references to the terms "Lender" or any other person pursuant to the definitions in the recitals hereto or otherwise shall include its respective successors and assigns.

(b)    All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular.

2.    Acknowledgement

2.1    Pre-Petition Obligations.

(a)    The Debtor hereby acknowledges, confirms, and agrees that the Debtor is indebted to the Lender for the Pre-Petition Obligations, in an amount not less than $6,334,979.60 as of the Petition Date, together with interest accruing thereon both before and, to the extent authorized under the Bankruptcy Code, after the Petition Date, as well as costs, expenses, fees (including reasonable attorneys fees, reasonable consultants fees, and actual legal expenses), and other charges now or hereafter owed by the Debtor to the Lender, all of which are unconditionally owing by the Debtor to the Lender, without offset, defense, or counterclaim of any kind, nature, and description whatsoever.

(b)     The Debtor hereby acknowledges, confirms, and agrees that (i) the Lender is not holding any funds in any reserve account in which either the Debtor or the Lender deposited funds for the purpose of paying taxes and other charges.  All amounts previously held by Lender in connection with the Pre-Petition Loan Agreements have been applied in accordance with such Agreements and the Debtor has no right to seek repayment of any such amounts.

2.2     Acknowledgment of Mortgage Lien and Security Interests.

The Debtor hereby acknowledges, confirms and agrees that the Lender has and shall continue to have valid, enforceable, and perfected first priority and senior mortgage liens and security interests upon and in all Pre-Petition Collateral heretofore granted pursuant to the Pre-Petition Loan  Agreements to secure all of the Pre-Petition Obligations; and (ii) the Lender has and it shall continue to have valid and enforceable first priority and senior mortgage liens and security interests in and upon all DIP Collateral granted to the Lender under the Interim and the Final Orders, under this Agreement or under any of the other DIP Documents, under the Pre-Petition Loan  Agreements, or otherwise granted to or held by the Lender.

2.3     Binding Effect of Documents.

The Debtor hereby acknowledges, confirms and agrees that: (a) each of the Pre-Petition Loan  Agreements is in full force and effect as of the date hereof, (b) the Pre-Petition Loan Agreements have not been modified, amended, or supplemented, except as set forth in this Agreement and the Interim Order, and the Pre-Petition Loan  Agreements together with this Agreement and the Interim Order constitute the entire agreement between the Lender and the Debtor with respect to the DIP Obligations, (c) the agreements and obligations of the Debtor contained in the Pre-Petition Loan  Agreements constitute the legal, valid, and binding obligations of the Debtor, enforceable by the Lender against the Debtor in accordance with the respective terms of the Pre-Petition Loan  Agreements, and the Debtor has no valid defense, offset, or counterclaim to the enforcement of such obligations by the Lender, and (d) the Lender is and it shall be entitled to all of the rights, remedies, and benefits provided for in the Pre-Petition Loan  Agreements, the DIP Documents, and the Interim Order.

3.     Adoption and Reaffirmation; Grant of Security Interests

3.1     The Debtor hereby (a) ratifies, reaffirms, assumes, adopts and agrees to be bound by the Pre-Petition Loan  Agreements, as amended and supplemented pursuant hereto and the Interim Order, and (b) agrees to pay all of the DIP Obligations in accordance with the terms of the Pre-Petition Loan  Agreements, as amended by this Agreement and the Interim Order.  All of the Pre-Petition Loan  Agreements are hereby incorporated herein by reference and hereby are and, as amended and supplemented pursuant hereto and to the Interim Order, they shall be deemed, adopted, and assumed in full by the Debtor, as Debtor and Debtor-in-Possession, and considered as agreements between the Debtor and the Lender.  The Debtor hereby ratifies, restates, affirms, and confirms all of the terms and conditions of the Pre-Petition Loan Agreements, as amended and supplemented pursuant hereto and the Interim Order, and agrees to be fully bound, as Debtor and Debtor-in-Possession, by the terms of the Pre-Petition Loan Agreements, and as amended and supplemented pursuant hereto and the Interim Order.

3.2     As collateral security for the prompt performance, observance, and payment in full of all of the DIP Obligations (including the Pre-Petition Obligations and the Post-Petition Obligations), the Debtor, as Debtor and Debtor-in-Possession, hereby grants, pledges and assigns to the Lender, and also confirms, reaffirms and restates the prior grant to the Lender of, the continuing first priority security interests in and senior liens upon, and rights of setoff against, all of the Pre-Petition and the Post-Petition Collateral.

4.     <u>Post-Petition Advances</u>

4.1     <u>Maximum Post-Petition Advance</u>.  Subject to and in accordance with the terms and conditions of this  Agreement, the Lender hereby agrees to advance to the Debtor up the Maximum Post-Petition Advance, to be applied first for purposes of refinancing in full the Pre-Petition Obligations, including all principal, interest, and other charges that are due and owing thereunder, and thereafter to fund the Revolver for those certain purposes identified in the budget attached hereto and incorporated herein by reference as <u>Exhibit B</u> (the "Budget").  Advances and repayments of the Revolver shall be in accordance with the following procedures only:

(a)     All cash, check drafts, money orders, proceeds of electronic funds transfers, direct deposits, automatic debits and other items of payment ("Items") that are paid to or received by or on behalf of the Debtor shall be exclusively deposited by the Debtor in an account established with the Lender (the "Account").  The Account shall be in the name of the Debtor, and all funds deposited therein shall be held subject to a first priority security interest granted to the Lender, and shall be solely under the direction and "control" of the Lender, as defined in the New Jersey Uniform Commercial Code, for the purpose of perfecting the Lender's first priority security interest therein.  All Post-Petition Advances to the Debtor under the Revolver shall be made be direct deposit into the Account;

(b)     In order to secure the repayment and performance by the Debtor of the DIP Obligations and as a material inducement for the Lender to make the loan contemplated by the DIP Facility, the Lender shall be authorized to transfer daily on each and every Business Day, i.e., sweep, all Account Proceeds on deposit in the Account to the repayment of the Revolver. Each Business Day, the Account shall be charged for the then collected balance in the Account in full and the amount thereof shall be applied first to costs and expenses (if any) that may have been incurred by the Lender, then to late charges, then to interest at the rate set forth in this Agreement, and the balance to the principal of the Revolver. For purposes hereof, "Account Proceeds" shall mean any and all Items of revenue paid to or received by the Debtor in connection with the Debtor's business operations, or otherwise, that are deposited into the Account; and "Business Day" shall mean every day that the Lender is open to the general public to transact general banking business.

(c)     All payments made on account of principal of the Revolver may be recorded by the Lender on a grid which, whether on a separate document or maintained electronically, shall be deemed incorporated herein and a part hereof in full; amounts recorded on such grid, or any amounts separately recorded by the Lender, electronically, by computer, or otherwise in accordance with the Lender's customary practices, shall be conclusive absent manifest error, but failure to make, or any error in, any such recordation, shall not affect the Debtor's obligation to repay the amounts due under the Revolver in the minimum weekly

6

amounts of principal and interest as set forth in the Budget, or such greater amount(s) as may be paid in accordance with the sweep provisions provided herein.. Payment of principal shall be paid in the amount of at least $2,500 per week over the course of the Budget, as set forth in the Budget, or such greater amount as may be paid in accordance with the Account sweep provisions set forth herein, together with the minimum amount of interest due on a weekly basis as set forth in the Budget, all after giving effect to the Account sweep provisions provided herein**.**

(d)      Unless otherwise approved by the Lender in writing (but without any obligation to do so), advances of principal by the Lender under the Revolver shall be made as and when the Debtor's checks to payees, either for services rendered or goods are sold to the Debtor as is provided in the Budget, are received by the Lender for clearance and negotiation under the New Jersey Uniform Commercial Code, provided that such checks are to vendors consistent with the type of expenses in, and do not exceed in the aggregate, the weekly line item expenses to fund the Debtor's expenses of the type set forth on the Budget. The Lender shall not be required to advance in any single week more than the amount of that week's total expenses as set forth in the Budget. If the amount of such checks exceeds the applicable weekly line item expenses as aforesaid, or if the total of the weekly expenses incurred by the Debtor exceed the aggregate of that week's expenses as set forth in the Budget, or if checks are submitted by payees that are not consistent with the Budget in any way, then the Lender may, in its sole discretion, (A) decline to pay such check or checks, (B) declare an event of default by the Debtor hereunder, or (C) in the Lender's sole discretion, fund such non-Budgeted expense or, as may be applicable, the amount by which a line item expense in the Budget is exceeded, and credit such advanced amount against the total of all of  the expenses in the Budget that may otherwise be advanced to the Debtor for the next following week or weeks, as the Lender may elect. Notwithstanding anything to the contrary contained herein, the Lender shall be under no obligation to make any advances or readvances that exceed the weekly or total amount of expenses as set forth in the Budget, either on a line item basis or in the aggregate of all budgeted expenses.

4.2      No Other Advances.  Notwithstanding anything to the contrary contained herein or in any of the Pre-Petition Loan  Agreements, the Debtor acknowledges and agrees that (i) the Lender shall not be obligated to advance to the Debtor any Post-Petition Advances except in accordance with the terms and conditions of this Agreement and the Interim Order, (ii) the Lender shall not be obligated to advance to the Debtor any sums in excess of the Maximum Post-Petition Advance, and (iii) only that portion of the Post-Petition Advances that comprises the Revolver shall be revolving, and the Debtor shall not otherwise have the right to re-borrow any sums paid to the Lender on account of Post-Petition Advances or Pre-Petition Obligations.

4.3      Interest.  The Debtor shall pay interest on all Post-Petition Advances at the rate of eleven and one-half (11.50%) percent per annum measured from the date advanced.  Interest shall be due and payable in accordance with the provisions of Section 4.1 above.  Payment of interest during the period covered by the Budget shall be paid in accordance with the Budget, or such greater amount as is provided in Section 4.1 (c) above

4.4      Advances.  The Post-Petition Advances shall constitute "advances" under the Pre-Petition Loan Documents and the Lender's obligation to make any Post-Petition Advances shall be governed by the Pre-Petition Loan Documents, as amended by this Agreement and the Interim Order. Each request for a Post-Petition Advance shall comply in all respects with the terms of

7

this Agreement and the Interim Order, and, in addition, may include (i) real estate taxes for the calendar quarters shown on the Budget, together with any interest or penalties with respect thereto, (ii) interest accrued and owing on account of Post-Petition Advances, (iii) amounts charged to the Debtor as DIP Obligations, including without limitation for reimbursement of expenses incurred by the Lender or its consultants, and (iv) such other amounts as are set forth in the Budget.

    4.5    Conditions Precedent.  In addition to the conditions set forth in the Pre-Petition Loan Documents, in this Agreement, or in any of the other DIP Documents or the Interim Order, the following shall be conditions precedent to the Lender's obligation to make any Post-Petition Advances unless the Lender, in its sole discretion, waives the applicability of such condition:

        (a)    The Debtor shall have paid the Lender any required loan or commitment fee;

        (b)    The Debtor shall have paid the reasonable costs (including without limitation the Lender's actual counsel fees and expenses) incurred by the Lender in connection with the negotiation, documentation, and approval by the Bankruptcy Court of this Agreement, the Interim Order, and related documents;

        (c)    As of the date of each such Post-Petition Advance, there shall be no default or event of default under this Agreement, the DIP Documents, or the Interim Order, other than the Existing Events of Default (as defined in Section 4.7 below); and

        (d)    The Bankruptcy Court shall have approved the DIP Documents and the Interim Order, and issues the Final Order in a form acceptable to the Lender, in its sole discretion, within thirty (30) days of the date of issuance of the Interim Order.

        (e)    Neither the Interim Order nor the Final Order shall include any terms that, in the Lender's sole an absolute judgment, adversely affect, modify, or are inconsistent with any of the terms and provisions of this Agreement or impair the ability of the Debtor to strictly perform its covenants and obligations under this Agreement, without regard to whether any of the foregoing terms and provisions are material, it being acknowledged that all of the terms and provisions of this Agreement, and the Debtor's strict and complete performance thereof, are and shall be deemed to be material to the Lender, in the absence of which the Lender would not have entered into this Agreement.

    4.6    Fees and Expenses.  The Lender's fees and all reasonable attorneys, accounts, and consultants fees and actual expenses incurred in connection with the negotiation, documentation, and approval of this Agreement and the Interim Order shall be due and payable as part of the Post-Petition Obligations in accordance with the terms, conditions, and provisions of this Agreement and/or the Interim and Final Orders.

    4.7    Certain Existing Events of Default Forbearance.

        (a)    The Debtor hereby acknowledges that certain events of default have occurred and are continuing as of the date of this Agreement under the terms and conditions of the Pre-Petition Loan Agreements (collectively, the "Existing Events of Default").

8

(b)        Subject to the terms and conditions of this Agreement and the Interim Order, the Lender agrees to forbear from the exercise of its rights and remedies against the Debtor on account of Existing Events of Default until the Termination Date (as defined in Section 4.8 of this Agreement).  Subject to the terms of the Interim Order, upon the occurrence of the Termination Date, the Lender may, at its election, (i) terminate its forbearance and declare all or any portion of the DIP Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtor; and (ii) exercise, in addition to rights and remedies now or hereafter existing at law, in equity, by virtue of statute, or otherwise, any and all rights and remedies under the Pre-Petition Loan Documents, this Agreement and/or the Interim or Final Orders.

(c)        Without waiving any rights or remedies available to the Lender at law, in equity, or both, with respect to any Existing Events of Default, the Lender shall make the Post-Petition Advances available to the Debtor notwithstanding the existence and continuation of any Existing Event of Default.  Notwithstanding the foregoing, the Lender shall have no obligation to fund any Post-Petition Advances in the event that any event of default under this Agreement, or the Interim or Final Orders occurs after the date of this Agreement.  Nothing contained in this Agreement shall be deemed to be a waiver of any default or event of default.

4.8      Term.  The Debtor hereby acknowledges that, notwithstanding anything to the contrary contained in this Agreement or in any of the DIP Documents, the Lender's obligation to make Post-Position Advances and its agreement to forbear from the exercise of its rights and remedies on account of Existing Events of Default shall expire on earliest to occur of (i) the ninetieth (90th) day after the date of this Agreement, or (ii) the occurrence, subsequent to the date of this Agreement, of a default under the DIP Documents and/or the Interim or Final Order, or (iii) the failure of any condition provided in this Agreement or in the Interim or Final Orders that is for the benefit of the Lender, or (iv) the non-issuance of a Final Order acceptable to the Lender in its sole and absolute discretion within thirty (30) days of the date of issuance of the Interim Order (as may be applicable, the "Termination Date"), whether or not the Lender has advanced to the Debtor Post-Petition Advances aggregating the Maximum Post-Petition Advance, and that from and after the Termination Date, the Debtor shall have no right to obtain any Post-Petition Advances from the Lender.    Upon written notice to the Debtor, the Lender may, from time to time and in its sole and absolute discretion, but the Lender shall not be obligated to, extend the Termination Date under subsection 4.8(i) herein for one or more successive periods of time as determined by the Lender.  The Debtor acknowledges and confirms that it has no expectation that any such extensions will be granted, and is entering into this Agreement without reliance upon the Lender's granting of any such extensions of the Termination Date.

PH1 2692551v1 12/20/10

5.      <u>Additional Representations, Warranties and Covenants</u>.   Except to the extent such representations, warranties, and covenants would be rendered inaccurate by virtue of the Debtor's Chapter 11 filing, in addition to the continuing representations, warranties, and covenants heretofore and hereafter made by the Debtor to the Lender, whether pursuant to the Pre-Petition Loan Agreements, the Interim or Final Orders, or otherwise, and not in limitation thereof, the Debtor hereby represents, warrants, and covenants to the Lender the following (which shall survive the execution and delivery of this Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition of the making of each loan or advance by the Lender.

        5.1      <u>Interim Order</u>.   The Interim Order has been duly entered, it is valid, subsisting, and it is continuing, and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by the Lender), and it is not subject to any pending appeal or stay, and the Debtor shall not, other than as may be agreed in writing by the Lender, seek, consent, or suffer to exist any reversal, modification, amendment, stay, vacatur of, and shall not appeal, the Interim Order.

        5.2      <u>Pre-Petition Loan Agreements</u>.   (a) Each of the Pre-Petition Loan Agreements is in full force and effect as of the date hereof, (b) the Pre-Petition Loan Agreements have not been modified, amended, or supplemented, except by this Agreement and the Interim Order, and the Pre-Petition Loan Agreements together with this Agreement and the Interim Order are the entire agreement between the Lender and the Debtor with respect to the DIP Obligations, (c) the Debtor has no valid defense, offset, or counterclaim to the enforcement of such obligations by the Lender, and (d) the Lender is and it shall be entitled to all of the rights, remedies, and benefits provided for in the DIP Documents and the Interim and Final Orders.

        5.3      <u>Use of Proceeds</u>.   All Post-Petition Advances provided by the Lender to the Debtor pursuant to the Interim Order, the DIP Documents, or otherwise, shall be used by the Debtor solely for the specific purposes set forth on the Budget with respect to each such Post-Petition Advance, unless otherwise agreed to by the Lender (or its designee) in writing, but without obligation of the Lender to so agree.

        5.4      <u>Lien Priority</u>.   The Debtor shall not suffer to exist any lien against any of the DIP Collateral, or a priority for any administrative expense claim arising pursuant to the Bankruptcy Code, which is equal or superior to the priority of the Lender's liens and claims in respect of the DIP Obligations, except for liens expressly permitted under the Interim Order and the Carve Out referred to and provided for in the Interim Order.

        5.5      <u>No Additional Indebtedness</u>.   Until the DIP Obligations have been paid and satisfied in full, and for so long as the DIP Obligations of the Debtor to the Lender exist, the Debtor shall be prohibited from incurring any debt, direct or contingent, other than ordinary course business debts that are provided to be paid in the Budget, and from entering into operating or other leases of any kind, without the prior written approval of the Lender, and regardless of whether or not any such indebtedness or leases results in the creation of any lien or encumbrance upon any of the Debtor's real or personal property; the foregoing shall include without limitation subsequently created purchase money security interests.

6.     Release and Indemnity

       6.1     Release of Pre-Petition Claims

               (a)     Upon the entry of the Interim Order, in consideration of the agreements of
the Lender contained herein and the making of any Post-Petition Advances by the Lender, and
for other good and valuable consideration, the receipt and sufficiency of which is hereby
acknowledged, the Debtor, on behalf of itself and its successors, assigns, and other legal
representatives, hereby absolutely, unconditionally and irrevocably releases, remises, and forever
discharges the Lender, its successors and assigns, and its present and former shareholders,
affiliates, subsidiaries, divisions, predecessors, partners, directors, officers, attorneys,
participants, employees and other representatives (the Lender and all such other parties being
hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and
from all demands, actions, causes of action, suits, covenants, contracts, controversies,
agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all
other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever
(individually, a "Pre-Petition Released Claim" and collectively, "Pre-Petition Released Claims")
of every name and nature, known or unknown, suspected or unsuspected, both at law and in
equity, which the Debtor, or any of its respective successors, assigns, or other legal
representatives may now or hereafter own, hold, have, or claim to have against the Releasees or
any of them for, upon, or by reason of any nature, cause, or thing whatsoever which arises at any
time on or prior to the day and date of this Agreement, including, without limitation, for or on
account of or in relation to, or in any way in connection with the Pre-Petition Loan  Agreements
and supplemented through the date hereof and the other DIP Documents.

               (b)     Upon the entry of the Interim Order, the Debtor, on behalf of itself and its
successors, assigns, and other legal representatives, hereby absolutely, unconditionally, and
irrevocably covenants and agrees with each Releasee that it will not sue (at law, in equity, in any
regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released
Claim released, remised, and discharged by the Debtor pursuant to this Section 6.1 If it violates
the foregoing covenant, it shall be an event of default hereunder and the Debtor agrees to pay, in
addition to such other damages as any Releasee may sustain as a result of such violation, all
reasonable attorneys fees and costs incurred by any Releasee as a result of such violation.

       6.2     Releases Generally

               (a)     The Debtor understands, acknowledges, and agrees that the releases set
forth above in Section 6.1 (collectively, the "Release") may be pleaded as a full and complete
defense and may be used as a basis for an injunction against any action, suit, or other proceeding
which may be instituted, prosecuted, or attempted in breach of the provisions of such releases.

               (b)     The Debtor agrees that no fact, event, circumstance, evidence, or
transaction which could not be asserted or which may hereafter be discovered shall affect in any
manner the final and unconditional nature of the Release.

       6.3     Indemnity

PH1 2692551v1 12/20/10

(a)      The Debtor will indemnify and hold the Releasees harmless from any and all claims, demands, losses, liabilities and expenses, including reasonable legal fees and expenses, resulting from or with respect to this Agreement, the DIP Documents, the Account, the DIP Facility, the Interim and Final Orders, and the transactions contemplated by each of the foregoing, including without limitation: (i) any action taken or not taken by the Lender in regard thereto in accordance with the terms of this Agreement, except for the Lender's gross negligence or willful misconduct; (ii) any Item, including without limitation, any automated clearinghouse transactions, which is returned for any reason and any adjustments; and (iii) any failure of the Debtor to pay any proper invoice or charge in respect to this Agreement or the Budget, or any amount owing to from the Debtor with respect to any of the foregoing.  This indemnity shall survive the Termination Date.

7.      <u>Other Conditions</u>.  In addition to any other conditions and covenants contained herein or in the Pre-Petition Loan  Agreements as in effect immediately prior to the date hereof, with respect to the loans and other financial accommodations available to the Debtor (all of which conditions, except as modified or made pursuant to this Agreement, shall remain applicable and be applicable to other financial accommodations available to the Debtor), the following shall at all times be satisfied be binding upon the Debtor, and shall be conditions to the performance of the Lender under this Agreement:

7.1      The Debtor shall furnish to the Lender all financial information, projections, budgets, business plans, cash flows, and such other information, as the Lender shall reasonably request from time to time;

7.2      As of the date hereof, there shall have been no termination of the Pre-Petition Loan Agreements;

7.3      The execution and delivery of this Agreement and all other DIP Documents, and such execution and delivery shall remain in effect, to be delivered in connection herewith by the Debtor in form and substance satisfactory to the Lender;

7.4      The Debtor shall execute and deliver to the Lender, and strictly perform under, this Agreement and all other DIP Documents, the Interim and Final Orders, and all other agreements, documents, and instruments which, in the good faith judgment of the Lender, are necessary or appropriate;

7.5      The implementation of the terms of this Agreement and the other DIP Documents are satisfactory to the Lender and its counsel;

7.6      Satisfactory review by counsel for the Lender of legal issues attendant to the post-petition financing transactions contemplated hereunder;

7.7      The Debtor shall have complied in full with the notice and other requirements of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to the Interim and Final Orders in a manner reasonably acceptable to the Lender and its counsel, and the Interim Order shall have been entered by the Bankruptcy Court;

7.8    Other than the voluntary commencement of the Chapter 11 Case, no material impairment of the priority of the Lender's security interests and liens in the DIP Collateral shall have occurred through and including the Petition Date;

7.9    No default or event of default (other than Existing Events of Default) shall exist at the time of, and would not result from the funding of, any requested Post-Petition Advance; and

7.10    The Interim Order shall have been entered by the Bankruptcy Court and shall be in full force and effect and not subject to any outstanding appeal, writ of mandamus, or other request for reconsideration, modification, or vacatur.

7.11    The Lender believes the DIP Collateral to be  at risk, or  the Lender believes it is otherwise insecure with respect to the  DIP Collateral or the ability of the Debtor to perform its covenants and obligations under this Agreement or the Interim or Final Order as approved by the Lender.

8.    Additional Events of Default.  In addition to the events of default set forth in the Pre-Petition Loan Agreements, the occurrence of any one (1) or more of the following events shall constitute an "event of default" under the DIP Documents:

8.1    The failure of the Debtor to comply with any of the covenants, conditions, and agreements contained herein, in the other DIP Documents, or in any other agreement, document, or instrument at any time executed by the Debtor in connection with the foregoing, including without limitation the timely payments of principal and/or interest to the Lender as set forth herein;

8.2    The Debtor's default under the Interim or the Final Order;

8.3    The Debtor shall fail to pay any of the DIP Obligations as and when due;

8.4    Any warranty, representation, or other statement made or furnished to the Lender by or on behalf of the Debtor proves to have been false or misleading in any material respect when made or furnished;

8.5    The Debtor fails to adhere to the Budget, except as may be expressly permitted by the Interim Order or agreed to in writing by the Lender (but without obligation to do so);

8.6    The occurrence of any material loss, theft, damage, or destruction not fully covered by insurance, or any sale, lease, or encumbrance of any of the DIP Collateral or the making of any levy, seizure, or attachment thereof or thereon;

8.7    Proceedings shall have been instituted for the foreclosure of, or exercise of any remedies with respect to, any mortgage, judgment, or other lien on, against or affecting any of the DIP Collateral; and

8.8    The Debtor merges or it is consolidated with any other person or entity.

PH1 2692551v1 12/20/10

8.9     The Debtor sells, transfers, leases, encumbers or otherwise disposes of any portion of the DIP Collateral, including without limitation substitutions or replacements thereof, without the prior written consent of the Lender, which may be withheld unless such DIP Collateral is first replaced by new, unused items of equal or superior quality and value, satisfactory to and as determined by the Lender.

9.     <u>Limited Waiver of Conditions Precedent</u>.  If the Lender shall make any Post-Petition Advance or otherwise extend credit to the Debtor under the DIP Documents at a time when any of the foregoing conditions (or any other conditions precedent set forth herein or in the Pre-Petition Loan  Agreements) are not satisfied (regardless of whether the failure of satisfaction of any of such conditions precedent is known or unknown to the Lender), the making of such Post-Petition Advance or extension of credit shall not operate as a waiver of the right of the Lender to insist upon the satisfaction of all conditions precedent with respect to each subsequent Post-Petition Advance or extension of credit, or as a waiver of any default or event of default as a consequence of the failure of any such conditions to be satisfied.

10.     <u>Miscellaneous</u>

10.1     <u>Amendments and Waivers</u>.  Neither this Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, and any such change, waiver, discharge, or termination may be effected only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge, or termination is sought.

10.2     <u>Further Assurances</u>.  The Debtor shall, at its expense, at any time or times, duly execute and deliver, or shall cause to be duly executed and delivered, such further agreements, instruments, and documents, including, without limitation, additional mortgages, security agreements, collateral assignments, New Jersey Uniform Commercial Code financing statements or amendments or continuations thereof, and the Debtor hereby consents to the exercise by the Lender of all the rights and remedies hereunder, under any of the other DIP Documents, the Interim or Final Orders, or applicable law with respect to the DIP Collateral, and the Debtor shall do or cause to be done such further acts as may be necessary or proper in the Lender's reasonable opinion to evidence, perfect, maintain, and enforce the security interests and liens of the Lender as provided in this Agreement, any of the other DIP Documents, or the Interim or Final Order. Upon the request of the Lender, at any time and from time to time, the Debtor shall, at its cost and expense, do, make, execute, deliver and record, register or file financing statements, mortgages, and other instruments, acts, pledges, assignments and transfers (or cause the same to be done) and deliver to the Lender such instruments evidencing items of DIP Collateral as may be reasonably requested by the Lender.

10.3     <u>Headings</u>.  The headings used herein are for convenience only and do not constitute matters to be considered in the interpretation of this Agreement.

10.4     <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.  In the making of proof of this Agreement, it shall not be necessary to produce or account for more than one (1) counterpart thereof signed by each of the parties

hereto. Delivery of an executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement as to such party or any other party.

10.5    <u>Costs and Expenses</u>.  The Debtor shall pay to the Lender on demand all costs and expenses that the Lender pays or incurs in connection with the negotiation, preparation, consummation, administration, enforcement, and termination of this Agreement and the other DIP Documents and the Interim Order, including, without limitation: (a) reasonable attorneys and paralegals fees and disbursements of counsel to the Lender; (b) costs and expenses (including reasonable attorneys and paralegals fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Agreement, the other DIP Documents, the Interim and Final Orders, and the transactions contemplated thereby; (c) taxes, fees, and other charges for recording any agreements or documents with any governmental authority, and the filing of financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of the Lender in the DIP Collateral; (d) sums paid or incurred to pay any amount or take any action required of the Debtor under the DIP Documents of the Interim and Final Orders that the Debtor fails to pay or take; (e) costs of appraisals, inspections and verifications of the DIP Collateral by the Lender or its agents and to attend court hearings or otherwise in connection with the Chapter 11 Case; (f) costs and expenses of preserving and protecting the DIP Collateral; and (g) costs and expenses (including reasonable attorneys and paralegals fees and disbursements) paid or incurred to obtain payment of the DIP Obligations, enforce the security interests and liens of the Lender, sell or otherwise realize upon the DIP Collateral, and otherwise enforce the provisions of this Agreement, the other DIP Documents and the Interim and Final Orders, or to defend any claims made or threatened against the Lender arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters).  The foregoing shall not be construed to limit any other provisions of the DIP Documents or the Interim or Final Orders regarding costs and expenses to be paid by the Debtor.  All sums provided for in this Section shall be part of the DIP Obligations and shall be payable on demand. The Lender is hereby irrevocably authorized to charge any amounts payable hereunder directly to the Account maintained by the Lender with respect to the Debtor, or to fund a Post-Petition Advance to satisfy any such charges.

10.6    <u>Conflict of Terms</u>.  If any provision contained in this Agreement is in direct conflict with, or inconsistent with, any provision in any of the DIP Documents (other than the Interim Order), the provision contained in this Agreement shall govern and control; in the event that any provision in this Agreement is in direct conflict with, or inconsistent with, any provision of the Interim Order, the provision of the Interim Order shall control.

10.7    <u>Effectiveness</u>.  This Agreement shall become effective upon the execution hereof by the Lender and the entry of the Interim Order.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

<u>DEBTOR</u>

ATLANTIC BROADCASTING OF LINWOOD NJ LIMITED LIABILITY COMPANY

15

By: _____

Name: _____

Title: _____

LENDER

SUN NATIONAL BANK


By: _____

Name: _____

Title: _____

16

EXHIBIT A
PRE-PETITION LOAN DOCUMENTS

PH1 2692551v1 12/20/10

## LOAN DOCUMENTS

Closing Under
Loan Agreement
Between
Sun National Bank
And
Atlantic Broadcasting of Linwood NJ Limited Liability Company

### Closing Date:  October 15, 2008

Borrower:                  Atlantic Broadcasting of Linwood NJ Limited Liability
                           Company, a New Jersey limited liability company

Bank                       Sun National Bank

1.   Loan Agreement

2.   Note

3.   First Mortgage and Security Agreement

        (a)   1601 New Road, Linwood, NJ (recorded November 5, 2008 in Book
              12911, Instrument No. 2008081332, to secure $2,100,000.00).
        (b)   300 Old Turnpike, Pleasantville, NJ
        (c)   1404 Ocean Drive, Strathmere (Upper Township), NJ

4.   Second Mortgage and Security Agreement

        (a)   1601 New Road, Linwood, NJ (recorded November 5, 2008 in Book
              12911, Instrument No. 2008081333, to secure $4,400,000.00).
        (b)   300 Old Turnpike, Pleasantville, NJ
        (c)   1404 Ocean Drive, Strathmere (Upper Township), NJ

5.   Assignments of Rents, Leases and Profits

        (a)   1601 New Road, Linwood, NJ (recorded November 5, 2008 in Book
              12911, Instrument No. 2008081334, to secure $2,100,000.00).
        (b)   300 Old Turnpike, Pleasantville, NJ
        (c)   1404 Ocean Drive, Strathmere (Upper Township), NJ

6.   Security Agreement

7.   Membership Pledge and Security Agreements, with a copy of Membership Interest and
     Certificates and Membership Interest Transfer Powers endorsed for transfer:

    (a)    Northwood Ventures LLC
    (b)    Northwood Capital Partners LLC
    (c)    Henry T. Wilson
    (d)    W. Stewart Cahn
    (e)    Brett DeNafo
    (f)    Michael Ferriola
    (g)    Paul Theophall
    (h)    Joseph Borsello, Jr.
    (i)    Joseph E. Kane and Anna Marie Kane

8.    Collateral Assignment of Contracts to Bank

9.    Environmental Indemnity Agreement

10.    UCC Financing Statement to be filed in New Jersey (Filed October 30, 2008, No. 2500711-4)

11.    Officer's Certificate of Borrower as to lawful operation of stations, representations and warranties and no events of default

12.    Loan Modification Agreement of November 30, 2009

EXHIBIT B
BUDGET

| Week Beginning | 12/13/2010 | 12/20/2010 | 12/27/2010 | 1/3/2011 | 1/10/2011 | 1/17/2011 | 1/24/2011 | 1/31/2011 | 2/7/2011 | 2/14/2011 | 2/21/2011 | 2/28/2011 | 3/7/2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | $ 26,000 | $ 8,500 | $ 8,500 | $ 15,000 | $ 25,000 | $ 35,750 | $ 28,000 | $ 28,500 | $ 35,000 | $ 41,000 | $ 47,500 | $ 47,500 | $ 48,000 |
| | | | | | | | | | | | | | |
| A/R Collections | $ 34,000 | $ 25,000 | $ 15,000 | $ 18,900 | $ 42,000 | $ 40,000 | $ 35,000 | $ 55,000 | $ 14,400 | $ 31,000 | $ 28,000 | $ 45,000 | $ 14,400 |
| Billboard Rent | | | | 7,000 | | | | | 7,000 | | | | 7,000 |
| Office Rent | | | | 5,600 | | | | | 5,600 | | | | 5,600 |
| Tower Rent | | | | 3,000 | | | | | 3,000 | | | | 3,000 |
| Total Collections | $ 34,000 | $ 25,000 | $ 15,000 | $ 34,500 | $ 42,000 | $ 40,000 | $ 35,000 | $ 55,000 | $ 30,000 | $ 31,000 | $ 28,000 | $ 45,000 | $ 30,000 |
| | | | | | | | | | | | | | |
| **Programming** | | | | | | | | | | | | | |
| Salaries | - | - | 9,200 | - | 9,200 | - | 9,200 | - | 9,200 | - | - | 9,200 | - |
| WOND Commission | - | - | 8,000 | - | - | - | - | - | 8,000 | - | - | 8,000 | - |
| ASCAP | - | - | 6,360 | - | - | - | - | 6,360 | - | - | - | 6,360 | - |
| BMI | - | - | 5,777 | - | - | - | - | 5,777 | - | - | - | 5,777 | - |
| SESAC | - | - | 1,415 | - | - | - | - | 1,415 | - | - | - | 1,415 | - |
| RCS Selector | - | - | 400 | - | - | - | - | 400 | - | - | - | 400 | - |
| Surfer Network | - | - | 300 | - | - | - | - | 300 | - | - | - | 300 | - |
| Program Consultant | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Programmer | - | - | 500 | - | 500 | - | 500 | - | 500 | - | - | 500 | - |
| Eagles Broadcast Fee | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Arbitron Fee | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Rush Limbaugh | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 |
| | | | | | | | | | | | | | |
| **Technical** | | | | | | | | | | | | | |
| Broadcast Technology | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 |
| Tech 21 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 |
| A.G. Technologies | - | - | 500 | - | - | - | - | 500 | - | - | - | 500 | - |
| Misc Parts | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Phone lines | - | - | 2,000 | - | - | - | - | 2,000 | - | - | - | 2,000 | - |
| Tower Rent | - | - | 3,500 | - | - | - | - | 3,500 | - | - | - | 3,500 | - |
| Tower Electric | - | - | 1,800 | - | - | - | - | 1,800 | - | - | - | 1,800 | - |
| Radio Comp Service | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| | | | | | | | | | | | | | |
| **Sales** | | | | | | | | | | | | | |
| Sales Manager | - | - | 2,500 | - | 2,500 | - | 2,500 | - | 2,500 | - | - | 2,500 | - |
| Sales Manager Override | - | - | - | - | 3,800 | - | - | - | 3,800 | - | - | - | 3,800 |
| Sales Manager Bonus | - | - | - | - | 2,000 | - | - | - | 2,000 | - | - | - | 2,000 |
| Sales Commission | - | - | - | - | 26,250 | - | - | - | 26,250 | - | - | - | 26,250 |
| National Rep Fee | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 |
| Travel | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| Expense Reimbursement | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 | 450 |
| Sales Manager Expense | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 | 125 |
| Sales Guarantees | - | - | 5,500 | - | 5,500 | - | 5,500 | - | 5,500 | - | - | 5,500 | - |
| | | | | | | | | | | | | | |
| **G & A** | | | | | | | | | | | | | |
| Salaries | - | - | 13,000 | - | 13,000 | - | 13,000 | - | 13,000 | - | - | 13,000 | - |
| Main Phone Service | - | - | 2,500 | - | - | - | - | 2,500 | - | - | - | 2,500 | - |
| Verizon Lines | - | - | 1,500 | - | - | - | - | 1,500 | - | - | - | 1,500 | - |
| Wireless Telecommunications | - | - | 1,000 | - | - | - | - | 1,000 | - | - | - | 1,000 | - |
| Utilities | - | - | 16,000 | - | - | - | - | 16,000 | - | - | - | 16,000 | - |
| Health Insurance | - | - | 3,200 | - | - | - | - | 3,200 | - | - | - | 3,200 | - |
| Property Tax | - | - | 6,000 | - | - | - | - | 6,000 | - | - | - | 6,000 | - |
| Payroll Processing | - | - | 500 | - | 500 | - | 500 | - | 500 | - | - | 500 | - |
| Payroll Taxes | - | - | 2,567 | - | 5,971 | - | 2,567 | - | 5,971 | - | - | 3,247 | 2,724 |
| Legal (FCC Cousel) | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 |
| Accounting Service | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 |
| Trash Removal | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| Insurance | 6,500 | - | - | 6,500 | - | - | - | 6,500 | - | - | - | 6,500 | - |
| Misc | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Marketron | - | - | 700 | - | - | - | - | 700 | - | - | - | 700 | - |
| Landscaping | - | - | 750 | - | - | - | - | 750 | - | - | - | 750 | - |
| Building Supplies | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Building Maint | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 |
| Office Supplies | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 |
| Elevator Service | - | - | 300 | - | - | - | - | 300 | - | - | - | 300 | - |
| Travel | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 |
| | | | | | | | | | | | | | |
| **Total Operating Expenses** | $ 13,170 | $ 6,670 | $ 94,439 | $ 13,170 | $ 83,891 | $ 6,670 | $ 40,437 | $ 67,172 | $ 83,891 | $ 6,670 | $ 6,670 | $ 109,619 | $ 41,444 |
| | | | | | | | | | | | | | |
| **Chapter 11 Expenses** | | | | | | | | | | | | | |
| US Trustee Fees | | | | | 5,000 | | | | | | | | |
| 12/15 Unpaid Wages | 65,000 | | | | | | | | | | | | |
| Utilities Deposit | 25,000 | | | | | | | | | | | | |
| Payment to Bank | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 |
| Holiday Bonus | | 8,333 | | | | | | | 8,333 | | | | |
| Debtor's Ch. 11 Attorney | | | | | | 33,333 | | | | | | 33,333 | 33,333 |
| Debtor's Accountant | | | | | | | | | | | | | 25,000 |
| Bank's Attorney | | | | | | 25,000 | | | | | 25,000 | | 25,000 |
| DIP Loan Interest (11.5% annualized) | | | | 450 | | | | 1,726 | | | | 2,649 | |
| **Total Chapter 11 Expenses** | $ 92,500 | $ 10,833 | $ 2,500 | $ 2,500 | $ 2,500 | $ 60,833 | $ 2,500 | $ 10,833 | $ 2,500 | $ 2,500 | $ 60,833 | $ 10,833 | $ 85,833 |
| | | | | | | | | | | | | | |
| **Weekly Expense** | $ 105,670 | $ 17,503 | $ 96,939 | $ 15,670 | $ 91,391 | $ 67,503 | $ 42,937 | $ 78,005 | $ 86,391 | $ 9,170 | $ 67,503 | $ 120,452 | $ 127,277 |
| | | | | | | | | | | | | | |
| **Beginning Cash** | $ - | $ (71,670) | $ (64,173) | $ (146,112) | $ (127,282) | $ (176,673) | $ (204,176) | $ (212,113) | $ (235,118) | $ (291,510) | $ (269,680) | $ (309,183) | $ (384,635) |
| Collections | 34,000 | 25,000 | 15,000 | 34,500 | 42,000 | 40,000 | 35,000 | 55,000 | 30,000 | 31,000 | 28,000 | 45,000 | 30,000 |
| Expenses | 105,670 | 17,503 | 96,939 | 15,670 | 91,391 | 67,503 | 42,937 | 78,005 | 86,391 | 9,170 | 67,503 | 120,452 | 127,277 |
| **Ending Cash** | $ (71,670) | $ (64,173) | $ (146,112) | $ (127,282) | $ (176,673) | $ (204,176) | $ (212,113) | $ (235,118) | $ (291,510) | $ (269,680) | $ (309,183) | $ (384,635) | $ (481,912) |

EXHIBIT C

FORM OF NOTE

$_____                                          _____, 2010

                                                         _____, New Jersey

      FOR VALUE RECEIVED, ATLANTIC BROADCASTING OF LINWOOD NJ LIMITED LIABILITY COMPANY, with an office located at 1601 New Road, Linwood, New Jersey 08221, the "Borrowers"), jointly and severally promise to pay to the order of Sun National Bank (the "Lender"), on the Termination Date (as defined in the Loan Reaffirmation and Amendment to Loan Agreement referred to below) or such earlier dates as are provided for in the Loan Reaffirmation and Amendment to Loan Agreement, the principal amount of _____ ($_____.00).

      The Borrower also promises to pay interest on the unpaid principal amount hereof from the date hereof until paid at the rates and at the times determined in accordance with the provisions of the Loan Reaffirmation and Amendment to Loan Agreement.

      All payments of principal and interest in respect of this Note shall be made in lawful money of the United States of America in same day funds at the office of the Lender in the manner described in the Loan Reaffirmation and Amendment to Loan Agreement.

      This Note is the Note referred to in, and is entitled to the benefits of the Loan Reaffirmation and Amendment to Loan Agreement, dated as of the date hereof (as amended, modified or supplemented, the "Agreement") between the Borrower and the Lender, which among other things provides for the acceleration of the maturity hereof upon the occurrence of certain events and for repayments in certain circumstances and upon certain terms and conditions. Terms defined in the Agreement have the same meanings herein.

      This Note is entitled to the benefits of and is secured by the Pre-Petition and Post-Petition Collateral, the DIP Liens, the DIP Documents, and all other security documents referred to in the Agreement.

      The Borrower hereby expressly waives presentment, demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note and the Agreement, and an action for amounts due hereunder or thereunder shall immediately accrue.

      The Lender and the Borrower intend to conform to all applicable laws limiting the maximum rate of interest that may be charged or collected by the Lender from the Borrower. Accordingly, notwithstanding any other provision hereof, Borrower shall not be required to make any payment to or for the account of the Lender, and the Lender shall refund any payment made by a Borrower, to the extent that such requirement or such failure to refund would violate or conflict with mandatory and non-waivable provisions of applicable law limiting the maximum amount of interest which may be charged or collected by the Lender from the Borrower. To the fullest extent permitted by law, in any action, suit or proceeding pertaining to this Note, the burden of proof, by clear and convincing evidence, shall be on the Borrower to demonstrate that this Paragraph applies to limit any obligation of Borrower under this Note or to require the Lender to make any refund, or claiming that this Note conflicts with any applicable law limiting

19

the maximum rate of interest that may be charged or collected by the Lender from the Borrower, as to each element of such claim.

This Note shall be governed by, and construed in accordance with, the laws of the State of New Jersey without giving effect to its choice of law principles.

IN WITNESS WHEREOF, each Borrower has caused this Note to be duly authorized, executed and delivered as of the date and the place first above written.


ATLANTIC BROADCASTING OF LINWOOD NJ LIMITED LIABILITY COMPANY


By: _____

Name: _____

Title: _____

20