**FOX ROTHSCHILD LLP**
**(formed In The Commonwealth Of Pennsylvania)**
1301 Atlantic Avenue
Midtown Building, Suite 400
Atlantic City, NJ 08401-7212
(609) 348-1515 (phone)/(609) 348-6834 (fax)
Michael J. Viscount, Jr., Esquire (MV 4219)
Joshua T. Klein, Esquire (JK 8978)
Brian R. Isen, Esquire (BI 9738)
mviscount@foxrothschild.com
jklein@foxrothschild.com
bisen@foxrothschild.com
*Proposed Attorneys for the Debtor*
*and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>ATLANTIC BROADCASTING OF LINWOOD NJ LIMITED LIABILITY COMPANY,<br><br>Debtor. | Chapter 11<br><br>Case No. 10-<br><br>Hon. _____ |

**AFFIDAVIT OF JOHN CARACCIOLO, CHIEF EXECUTIVE**
**OFFICER OF THE DEBTOR IN SUPPORT OF FIRST-DAY MOTIONS**

| | | |
|---|---|---|
| State of New York | : | |
| | : | SS |
| County of Suffolk | : | |

JOHN CARACCIOLO, being first duly sworn upon oath, deposes and states as follows:

**Qualifications of Affiant**

1. I am the Chief Executive Officer of Atlantic Broadcasting of Linwood NJ Limited Liability Company (the "Debtor", "Atlantic Broadcasting" or the "Company"). I submit this Affidavit in support of the first day motions ("First Day Motions") that the Debtor has filed or shortly will file in this Court seeking emergency relief following the commencement of their

voluntary Chapter 11 cases on December 20, 2010 (the "Petition Date"), under the 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

2. I received my B.A. in Communications from the New York Institute of Technology. For over 20 years I have held various positions with a variety of media companies, primarily focusing on the radio-broadcasting industry. I have worked at many levels within radio stations, from engineer, chief engineer to general manager, as well as executive positions within broadcast companies. I have owned and operated performing-arts venues, including the Vanderbilt, which is a 8500-seat outdoor concert facility in Long Island, New York. I have owned and/or managed operated more than 15 radio stations over the past 20 years. In 2002, through a company I control, I launched the *New Island Ear* entertainment guide. The *New Island Ear* was re-launched in 2003 as the *Long Island Press*, which is an award-winning news, arts and lifestyle newspaper. The *Long Island Press* has received numerous awards and nominations, including from the Press clue, FOLIO, and recently had a piece nominated for a Pulitzer Prize.

3. I have been employed by Atlantic Broadcasting since March 15, 2010, and have served as Chief Executive Officer since December 10, 2010. As Chief Executive Officer of Atlantic Broadcasting, I oversee the general management, financial, and operations management of Atlantic Broadcasting. In that capacity, I have reviewed, worked with, and have knowledge of the books and records of the Company, including its current and historical financial statements, projections, business plans, business analyses and reports, contracts and other legal documents, notes and correspondence and the like. In that capacity, I also have participated directly in discussions and negotiations with lenders, vendors and customers of Atlantic Broadcasting, and worked closely with the Company's professionals in respect of these matters.

4. Based on all of the foregoing, I am familiar with the Company's books and records, which are maintained in the ordinary course of business under my supervision, the Company's business and financial history, its operations, and its current business and financial situation. Accordingly, if called as a witness, I could and would competently testify to the matters set forth herein from my own personal knowledge.

**Company Background**

A. **The Company**

5. Atlantic Broadcasting operates five prominent radio stations (the "Stations") in the Atlantic City and Cape May, New Jersey, markets from a central location at 1601 New Road in Linwood, New Jersey. Broadcasts formats including Rock, Talk, Spanish, Top 40 and Classic Hits. A chart outlining the Stations is listed below.

| Name | Band | Station | City of License | Broadcast Area | Branding | Genre |
|---|---|---|---|---|---|---|
| WTKU | FM | 98.3 | Petersburg, NJ | Atlantic City, NJ | Kool 98.3 | Classic Hits |
| WMGM | FM | 103.7 | Atlantic City, NJ | Atlantic City, NJ | The Shark 103.7 | Classic Rock |
| WBSS | AM | 1490 | Pleasantville, NJ | Atlantic City, NJ | La Fiesta | Spanish |
| WOND | AM | 1400 | Pleasantville, NJ | Atlantic City, NJ | News/Talk 1400 | News/Talk |
| WWAC | FM | 102.7 | Ocean City, NJ | Atlantic City, NJ | Wild 102.7 | Top 40 |

6. The Company was formed in May 2008 when it signed an agreement to purchase broadcast licenses and radio station business assets from Access.1 Communications Corp. for $9.5 million. Together with a local management team, Northwood Ventures LLC and Northwood Capital Partners LLC (collectively, "Northwood") led the leveraged buyout that closed on October 15, 2008, with $6.5 million of funding by Sun National Bank (the "Secured Lender") and capital contributions by Northwood and other investors. Northwood made a follow-on investment in 2009.

3

7. The branding for the Stations is as follows:











8. The Company's primary assets consist of the following: (a) the Stations; (b) the radio broadcast licenses, permits and authorizations (the "FCC Licenses") issued by the United

4

States Federal Communications Commission (the "FCC") for the Stations; (c) a transmitter and communications tower located at 300 Old Turnpike, Pleasantville, New Jersey; (d) a transmitter and communications tower located at Ocean Drive, Strathmere, New Jersey; (e) a transmitter located at 3101 Boardwalk, Atlantic City, New Jersey and (f) real property consisting of an office building located at 1601 New Road, Linwood, New Jersey 08221, which is the Company headquarters and which houses the Company's broadcast studios..

B.  **Debt and Equity Structure**

9.  On October 15, 2008, the Debtor entered into a Loan Agreement and signed associated documents and instruments or indebtedness and security (the "Prepetition Loan and Security Documents") in connection with a loan of $6.5 million (the "Prepetition Loan") made by the Secured Lender.  The Prepetition Loan is secured by substantially all of the Debtor's assets, including all of the real estate, transmission towers, equipment, accounts and other tangible and intangible personal property as and to the extent described in the Prepetition Loan and Security Documents (the "Prepetition Collateral").  It is the position of the Debtor that the Prepetition Collateral does not include the FCC Licenses (as defined above and in the Prepetition Loan and Security Documents).  As of the Petition Date, the most recent information provided to the Company by the Secured Lender indicates that the amount due on the Prepetition Loan, including accrued interest and unpaid principal totals approximately $6.3 million (the "Prepetition Secured Debt").

10.  According to the Company's books and records, as of the Petition Date, the Company owes approximately $1,181,811.39 in unsecured debt.  The unsecured debt of the Company consists of trade debt, lease obligations and other debt arising from the operations of the Company's business, as well as several judgments.

11. The Company's equity structure as of the Petition Date – ownership of membership interests in the Company, on a fully diluted basis – is as follows:

|  | Amount (%) |
|---|---|
| Northwood Ventures, LLC | 75.25 |
| Northwood Capital Partners, LLC | 12.69 |
| W. Stewart Kahn | 6.41 |
| Brett DeNafo | 1.68 |
| Henry T. Wilson | 1.60 |
| Mike Ferriola | 1.33 |
| Joe Borsello | .70 |
| Paul Theophall | .33 |

12. Total equity funding is approximately $5.9 million, of which $4.8 million or 78% has been funding by Northwood.

C. **Events Leading to the Chapter 11 Filing**

13. In early 2008, Northwood was introduced to Mr. Brett DeNafo by W. Stewart Cahn of Cahn Capital Corp., a New York-based investment banker. At that time, Mr. DeNafo along with other members of his management team (Michael Ferriola, Paul Theophall, and Keith Fader) had negotiated to purchase the radio assets of Access.1 Communications ("Access1") in southern New Jersey (the "Radio Assets") including WMGM, WOND, WJSE (now WWAC), WTAA (now WBSS) and WTKU. Following several meetings with Mr. DeNafo and members of his management team, and after conducting due diligence, Northwood decided to invest in the acquisition of the Radio Assets. In May 2008, the asset purchase agreement between the Company and Access1 was executed and the Company entered into a time brokerage agreement

6

in order to take over day to day operations of the Radio Assets, pending FCC approval. Following, FCC approval in October of 2008, the sale closed and the Company took possession of the Radio Assets.

14. For the fourteen (14) to fifteen (15) months following closing of the acquisition, the Company operated under Mr. DeNafo's leadership. During this time, the Company consistently generated operating deficits. Northwood along with certain other minority investors continued funding the operating deficits, investing an additional $900,000 of equity to try to keep the Company liquid and current on its obligations to the Prepetition Secured Lender. During February 2010, the investors chose to terminate Mr. DeNafo for poor performance. At that time I took over day to day management of the Company with the assistance of Paul Homer of Northwood, who is the Vice-President of Atlantic Broadcasting

15. Following, Mr. DeNafo's termination, the new management learned of numerous instances of breaches of fiduciary duty, breaches of the duty of loyalty, mismanagement and breach of contract, among others, including, but not limited to (i) the existence of numerous unpaid bills that were not brought to the investors' attention, (ii) theft of funds and services from the Company by Mr. DeNafo, (iii) the existence of one or more "agreements" to issue and/or transfer membership interests in the Company to third parties without seeking or obtaining approval of the Board as required by the Operating Agreement and the related application by Mr. DeNafo of funds advanced by such third parties to his own personal use and benefit, (iv) numerous lawsuits and/or judgments by vendors who had not been paid by the Company, (v) sales below the level of expenses that were being incurred by the business on a monthly basis, (vi) numerous situations of misrepresentation by Mr. DeNafo, as shown by presentation of a fraudulent loan modification agreement to investors, and representation that the Arbitron, Inc.

7

contract for ratings services (totaling $1.3 million) would be terminated at no cost to the Company.

16. Although current management and I did everything possible to keep the Company afloat, including expense reductions in excess of $150,000 per month, reducing the headcount and hiring a new local management team, the Company has been unable to get out of the legacy debt created by the prior management team, and beginning in September 2010, was unable to fulfill its obligations to the Prepetition Secured Lender under the Prepetition Loan. Thus, with no options, the Company was forced to file Chapter 11 in order to pursue a going concern sale of its assets in order maximize value for the estate and its creditors.

### D. First Day Motions

#### Employee Compensation and Benefits Motion

17. Prior to the Petition Date and in the ordinary course of business, the Debtor provided its employees (the "Employees") with wages, salaries, commissions and other compensation and benefits. However, in the lead up to this bankruptcy filing and short on necessary liquidity, the Debtor was forced to defer a payroll payment to its employees on Wednesday, December 14, 2010 (the "Deferred Payroll") until after the Petition Date when it could be funded by a debtor in possession loan. The Debtor seeks authority, in its discretion, to fund the Deferred Payroll and to pay and/or honor, as the case may be, certain other prepetition claims for wages, salaries, benefits and unpaid reimbursable expenses incurred by employees on behalf of the Debtor, employee deductions, and certain costs incident to the foregoing (the "Employee Wages and Benefits").

18. In addition, under the Employee Compensation and Wage Motion, the Debtor seeks the Court's authority to implement a Holiday Bonus program that will permit the payment

8

PH1 2684370v1 12/20/10

of up to $25,000 to employees who remain employed as of the end of weeks 2, 8 and 13 after the Petition Date, if, as and to the extent funded under the DIP loan which is the subject of a separate first day motion.

19. The Debtor's employees are essential to the success of the business. Consequently, it is critical that the Debtor continue to honor it prepetition obligations to the Employees and to pay have the option to pay the Holiday Bonus.

20. If the Employee Obligations and Benefits are not honored and timely paid postpetition, the Debtor's employees may suffer personal hardship and may be required to bear personally expenses that were incurred on behalf of the Debtor with the expectation that they would be reimbursed. If the Debtor is not able to honor these obligations, I expect that the Debtor will suffer a significant loss of goodwill with its Employees. A significant deterioration in morale among Employees at this critical time undoubtedly would have a negative effect on the Debtor, its customers, the value of its assets and its ability to achieve their objectives in Chapter 11.

  **A.**  **Prepetition Wages, Salaries & Commissions**

21. The Debtor employs approximately thirty four (34) Employees. As of the Petition Date, the Employees had earned or accrued in their favor various prepetition wages for (i) wages and salaries,[1] and (ii) Employee benefits, including, without limitation, those due to or for the benefit of Employees under various health, life and savings plans.

22. The Employees of the Debtor are paid on the 15th and 30th of each month and commission based Employees are paid once a month on the 15th of each month. The Debtor's payroll is generally distributed approximately five (5) days in arrears. The Debtor's total average pay period obligations are approximately $60,000, which varies given the fact that

9

commission Employees are only paid once per month. As of the Petition Date, no Employees are owed in excess of the $10,950 statutory cap set forth in section 507(a)(4) of the Bankruptcy Code. Specifically, the gross amount of prepetition wages that needs to be paid to the Employees for the prepetition period is approximately $58,418. In addition, the gross amount of benefits that needs to be paid for the same prepetition period is approximately $3,300.

### B. Reimbursable Business Expenses

23. The Debtor customarily reimburse its Employees who incur a variety of business expenses in the ordinary course of performing their duties on behalf of the Debtor (the "Business Expenses"). Although the Debtor is unaware of any outstanding Business Expenses as of the Petition Date, it is likely that not all requests for reimbursement were submitted as of the Chapter 11 filings. Accordingly, the Debtor does not know the precise amount of incurred but unreimbursed Business Expenses, but the Debtor estimates that the amount is less than a total of $5,000.

### C. Employee Benefits Program

24. The Debtor's sponsor health and benefit programs for the Employees. The major benefit programs are as follows:

#### a. Medical Insurance

The Debtor provides medical insurance coverage through Horizon Blue Cross as the insurer. The Debtor absorbs the majority of the costs under the Plan because the Debtor pays one hundred percent (100%) of the premiums for each individual Employee and a portion of each Employee and dependents on a sliding scale depending on the number of independents. The average monthly cost of the medical insurance is $3,300, which is deducted from payroll.

---

[1] The Debtors are not seeking to pay any amounts due to Employees arising under accrued vacation time.

10

b.  **Short Term Disability/Life Insurance**

The Debtor provides short term disability for all Employees, with premiums being paid through payroll deductions. The Debtor provides long term disability for all Employees, which is also paid by each Employee that elects and is deducted out of each payroll. Similarly, the Debtor also provides life insurance to all Employees who elect, which is paid by each Employee who so elects. So the Debtor itself has no monetary obligations with respect to the short term disability and life insurance programs.

c.  **401(k) Savings Plan**

The Debtor provides an opportunity for Employees to participate in the Debtors' 401(k) plan. Eligible Employees comprise those individuals who have been employed by the Debtor longer than ninety (90) days. Employees make elective deferrals up to the maximum allowable by law by way of payroll deductions, which are collected by Advantage Payroll Services (the Debtor's payroll servicer)[2] and remitted to the John Hancock, the 401(k) record keeper, by the Debtor. Under the 401(k) plan, the Debtor does not match, to any extent, any Employees' contribution amounts. So the Debtor itself has no monetary obligations with respect to the 401(k) plan other than the minimal costs of administration of the 401(k) plan, which is set at $400 per quarter.

d.  **Holiday Bonus**

The Debtor seeks the Court's authority to implement a Holiday Bonus program that will permit the payment of up to $25,000 to employees who remain

11

employed as of the end of weeks 2, 8 and 13 after the Petition Date, if, as and to the extent funded under the DIP Facility (defined below) which is the subject of a separate first day motion. The employees were informed on December 14, at the time when they were told that they would not receive their payroll checks on December 15, that the Debtor would request that the DIP Lender fund and that the Court approve payment of this bonus for employees other then management.

25. Thus, the gross amount of prepetition Employee Wages and Benefits that needs to be paid to the Employees for the prepetition period is approximately $61,448.

## Motion for Maintenance of Bank Accounts and Forms

26. As of the Petition Date, the Debtor maintained four (4) bank accounts. A chart listing all of the Debtor's bank accounts (the "Bank Accounts") is attached the motion seeking authority to use existing bank accounts and business forms as Exhibit A.

27. In the ordinary course of business, the Debtor uses numerous varieties of business forms. To minimize expenses to its estate and avoid confusion on the part of employees, customers and vendors, the Debtor respectfully requests that the Court authorize the Debtor to continue to use all correspondence and business forms (including, without limitation, checks, letterhead, purchase orders and invoices (collectively, the "Business Forms") as such forms were in existence immediately before the Petition Date without reference to the Debtor's status as Debtor in possession, *provided however,* that upon depletion of the Debtor's Business Form stock, the Debtor will obtain new check stock reflecting its status as debtor in possession. With such authorization, the Debtor will be able to avoid the expense and delay of ordering entirely new business forms.

---

[2] All Federal and State payroll withholding taxes (along with Employee deductions, the "Withholding Obligations") are automatically paid directly to the various taxing authorities by Advantage Payroll Services, approval of which is

12

28. The Company's transition, into Chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of the cases with the same account numbers and, where applicable, automated relationships. I do not believe that allowing the Debtor to maintain the Bank Accounts will prejudice any party or the estate.

29. If the Debtor is forced to close its Bank Accounts, disruption and confusion likely would result, which would negatively impact the Debtor and its efforts to maximize value for its stakeholders. Any unnecessary delay in processing payments for postpetition goods or services may adversely affect the Company's relationship with vendors and customers, which are already being burdened by the filing of the Chapter 11 Case.

**Motion to Approve Debtor-in-Possession Financing and Use of Cash Collateral**

30. The Debtor is requesting the entry of an order authorizing the Debtor to obtain postpetition financing provided by the secured postpetition financing on a superpriority basis (the "DIP Facility") pursuant to the terms and conditions contained in a Reaffirmation and Amendment to Loan Agreement which reaffirms and amends the Prepetition Loan and Security Documents between the Debtor and Sun National Bank (the "DIP Lender")to (i) refund the Prepetition Secured Loan and (ii) extend new funding on a revolving basis under a line of credit facility of up to **[$550,000.00]**, all to provide the Company with the liquidity necessary to operate in Chapter 11. With access to the liquidity provided by the DIP Facility, the Debtor will have the ability to maintain its business as a going concern, retain the ability to operate, maintain business relationships with its vendors, suppliers, and customers, pay their employees and pursue its goals in Chapter 11.

31. As a consequence of the factors described above, the Debtor has insufficient cash to maintain business relationships with their vendors, suppliers, and customers, and, in the event

---

also sought by this Motion.

PH1 2684370v1 12/20/10

that any or all of those relationships are adversely affected by the commencement of these cases, the Debtors could face the prospect of having insufficient cash to finance their operations. Furthermore, and importantly, the DIP Facility is needed to fulfill its payroll obligations to its employees, which, if lost, would have an immediate adverse effect on the going concern value of the Company. The Debtor urgently needs credit and additional capital to mitigate any negative effect of these cases and to continue their businesses and operations. Absent availability of new credit, the going-concern value of the Debtor's business will be severely negatively impacted. The Debtor attempted, but was unable to obtain funding on an unsecured basis from other sources. Therefore, the DIP Facility presents the best funding on the best terms that the Debtor was able to secure.

32.     It is essential to the success of these cases that the Debtor immediately obtain access to sufficient post-petition financing, without which the Debtor's ability to maintain its business operations will be compromised. The Debtor's continuing ability to maximize the value of its estate for the benefit of its creditors, and their ability to pursue the a sale as a going concern depend heavily upon the expeditious approval of the DIP Facility and the related actions requested herein.

33.     Accordingly, the Debtor requires the availability of working capital from the DIP Facility and the use of cash collateral. The DIP Facility will instill a sense of confidence in the Debtor's customers, vendors, employees and other important stakeholders. The Debtor critically needs the support of these stakeholders at this time, as the loss of their support could severely impair the Debtor's ability to maximize the value of their estates.

34.     In sum, without the immediate access to post-petition financing, the Debtor expects to suffer immediate and irreparable harm to its estate and creditors. The Debtor's ability

PH1 2684370v1 12/20/10

to preserve the value of its estate for the benefit of its creditors depends upon the interim and final relief requested in the DIP Motion.

E. **Other Motions**

**Application to Employ Fox Rothschild LLP as Counsel to the Debtor**

35. The Debtor seeks to employ and retain the firm Fox Rothschild LLP ("Fox") as its bankruptcy counsel with regard to the filing and prosecution of these Chapter 11 cases. Fox has provided certain legal services to the Debtor since May 2010.

36. The Debtor has chosen Fox as their counsel because of their prior relationship with Fox, Fox's extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code, and because of the Fox's expertise, experience and knowledge practicing before this Court. In preparing for its representation of the Debtor in this case, Fox has become familiar with the Debtor's business affairs and many of the potential legal issues which may arise in the context of this Chapter 11 case.

37. Accordingly, I believe that Fox is both well-qualified and uniquely able to represent the Debtors in these cases.

**Motion for Order Establishing Interim Compensation
Procedures for Professionals and Committee Members**

38. The Debtor is requesting approval of certain procedures for compensating and reimbursing court-approved professionals on a monthly basis, which I am informed are comparable to the procedures established in other similar Chapter 11 cases in this district and the Third Circuit.

39. As described above, the Debtor seeks approval to employ Fox as their bankruptcy counsel. The Debtor may need to retain other professionals in this Chapter 11 case as the need

may arise. In addition, I am informed that an official committee of unsecured creditors may be appointed (the "Committee"), and the Committee also may seek to retain various professionals (the "Committee Professionals").

40.     I am informed that entry of an interim compensation order will streamline the professional compensation process and enable the Court and all other parties to more effectively monitor the professional fees incurred in this Chapter 11 case. Further, it will avoid forcing professionals to finance this bankruptcy case while awaiting final approval of their fees and expenses. I believe that such relief is in the best interests of the Debtor's estate.

41.     I declare under penalty that to the best of my knowledge, the foregoing is true and correct.

                                                                                 /s/ John Caracciolo
                                                                                 John Caracciolo , CEO

Sworn to and Subscribed
Before me this 20th day
of December, 2010

/s/ Janet Le Porin
Notary Public:

My commission expires: 1/24/12